## MOORE *v.* MOORE.[*]

December, 1860.

One who executes a bond secured by a mortgage on his wife's separate estate, for the benefit of a third person, is not primarily liable on the bond. The premises mortgaged are the primary fund, and he is not, as tenant by the curtesy, bound to discharge it.

The implication of a promise to pay for services rendered and accepted,— *e. g.*, for medical attendance,—is less strong when the parties, though both adults, are parent and child, than in other cases ; and if, in addition, it appears that the services were rendered without expectation on either side that compensation would be made, the one rendering them cannot afterward recover on a *quantum meruit.*

M. Price Moore, executor of Lewis Moore, deceased, appealed to this court from a decision of the supreme court, affirming a decree of the surrogate of the city and county of New York, made on a final settlement of the executor's accounts.

The testator died in 1843, at his residence in New Jersey, and in the same year the executor, his son, filed an inventory showing fifteen thousand dollars personal assets. The executor then claimed two thousand five hundred dollars to be due to himself for his services as testator's agent; and this was the only claim he then made.

In the same year he applied to the proper court in New Jersey for an order that testator's real property be sold for payment of debts, but the application was denied. He made a similar application in New York, in 1844, in which he made a claim for services as physician, in the sum of three thousand three hundred dollars, for medical attendance in 1839 to 1842, which application was denied, and the decree was affirmed by the supreme court. Reported in 14 *Barb.* 27.

For twelve years after filing the inventory, his accounts remained unsettled, although proceedings for the purpose were instituted by the parties interested.

After a long contest, the late surrogate Bradford made in 1855 the decree against the executor, now appealed from.

---

[*] Followed in 28 *N. Y.* 497 ; see, also, note at the end of this case.

On this accounting the executor claimed, among other things, the same sum of three thousand three hundred dollars for medical attendance, and also the sum of four thousand five hundred and eighteen dollars and thirty-seven cents, paid by him to the United States Insurance Company under the following circumstances: The testator in his lifetime had given his own bond for ten thousand dollars, and he and his wife had given a mortgage on the wife's separate estate to secure the bond, to enable the son to borrow money from the insurance company with which to pay off an incumbrance on property belonging to the son. The son, instead of paying off the incumbrance (a mortgage), allowed the property to be sold under foreclosure, and took a deed conveying it to the testator. The testator and wife subsequently conveyed the property to the son. The latter made payments on account of the accommodation mortgage to the insurance company, which he charged against his father, the testator, and claimed in account as above stated; and also claimed that the last deed of the property was a gift to him from his father.

*The surrogate* held, in respect to the claim for professional services, that the parental relation, the absence of any claim or demand in testator's lifetime, and the executor's declaration in the New Jersey court, that he had exhibited a true statement of the debts, all tended to show that there was no contract, express or implied.

In respect to the payments to the insurance company, he held that they were for the benefit of the executor, and he himself was primarily liable for that mortgage.

The supreme court affirmed the decree, and the executor appealed to this court.

*James T. Brady,* and the executor in person, for the appellant;—Insisted that, in the case of medical services, a promise to pay is implied from the fact that the services were rendered and accepted, an express contract being here almost entirely unknown; and the claim could not be rejected on account of a secret intent not to charge for the services, or the suspension of the purpose to make a charge;—citing *Pars. on Contr.* 370,

537, 529; Maybee· *v.* Sniffen, *E. D. Smith*, 1; and that the surrogate's rejection of the claim in the petition for a sale was not an adjudication. Fitzpatrick *v.* Brady, 6 *Hill*, 581.

*Thomas C. T. Buckley*, for the respondent;—Cited 1 *Pars. on Contr.* 530, n.; King *v.* Sow, 1 *Barn. & Ald.* 179; Williams *v.* Hutchinson, 3 *N. Y.* (3 *Comst.*) 312; Davies *v.* Davies, 9 *Carr. & P.* 87; James *v.* Driscoll, 2 *Bay.* 101; Bowen *v.* Bowen, 2 *Bradf.* 336; Winchell *v.* Latham, 6 *Cow.* 690.

WRIGHT, J. [After stating the facts, and disposing of an objection resulting from a misconception of the decree.]—2. As to the claim for moneys paid to the United States Fire Insurance Company.

The facts on which the claim is founded, were substantially these: The testator's wife, the mother of the executor, as heir at law of Stephen Price, was interested in one-half of No. 104 Broadway and one-half of No. 52 Courtlandt-street, and in September, 1840, she, with her husband, conveyed the same to the appellant. From that time, neither the testator nor his wife had any interest in the property. The property was subject to a mortgage to Henry H. Watson, on which was due, in February, 1841, ten thousand dollars of principal, besides interest, and which was being foreclosed. The appellant applied to the testator to raise ten thousand dollars, for him to pay off the mortgage, and it was arranged to raise the money by mortgaging premises No. 82 John-street, the separate property of the testator's wife, and in which the testator had no interest, except as tenant by the curtesy, the appellant promising to keep down the interest and pay off the mortgage as soon as he could. It would seem that the appellant had ascertained that he could procure the money from the insurance company, if secured by a mortgage on the John-street property, for he and the counsel for the company, upon the application being made, went over to Hackensack to see the testator, who was infirm; having provided themselves with a blank power of attorney to be executed by the testator to the appellant to borrow the money, execute a bond for its payment in the name of the testator, upon such terms and at such times as the at-

III—20

torney should see fit, and also, in the testator's name, to execute a mortgage, in conjunction with his wife, on the John-street property. The ten thousand dollars was procured from the insurance company, the appellant, as the attorney of the testator, and the testator's wife, executing the mortgage; and the appellant also, as such attorney, executing in the name of the testator the bond accompanying the mortgage. The appellant received the money from the insurance company, and with some six thousand one hundred and forty-six dollars, provided by himself, purchased an assignment of the Watson bond and mortgage. The foreclosure suit was suffered to proceed, and the mortgaged premises, at the master's sale, were bought in, in the name of the testator, the appellant conducting the entire business. In June, 1841, shortly after the conveyance of the property, by the master conducting the sale, to the testator, the latter, with his wife, conveyed it to the appellant, the consideration expressed in the deed being eleven thousand one hundred and forty-eight dollars, the sum paid for the assignment of Watson's mortgage. There was really nothing paid to the testator by the appellant; and in his examination before the surrogate, he pretended that the deed was a gift from his father.

The effect of the transaction was to release the property in Broadway and Courtlandt-street, one-half of which was owned by the appellant, from the operation of the Watson mortgage, and then, as such mortgage was given by Price, the original owner, to vest an unincumbered title to the property in the appellant. During the lifetime of the testator, the appellant paid the interest and three thousand dollars of the principal of the mortgage held by the insurance company, and at home, when it was talked of by the testator and his wife, he assured them he was paying it off as fast as he could, and repeatedly promised to discharge it altogether; he also paid the interest for two or three years after the testator's death; made no charges of these payments against the testator in his books of account; and there can be no pretense from the proof that they were made as agent for the testator in his lifetime or as executor after his death. He informed his mother that he had paid three thousand dollars of the principal of this mortgage,

and on several occasions assured her that she should never lose a dollar by it. He finally stopped paying interest on the mortgage in 1846, assigning as a reason to his mother that, as there was difficulty in the family, he would wait until the business was arranged, and then he would settle with her. It was the moneys amounting to four thousand five hundred and eighteen dollars and thirty-seven cents, thus paid to the insurance company for a part of the principal and accruing interest on a mortgage on the separate property of the testator's wife, and which the appellant was equitably bound to pay and discharge, that he sought to establish as a claim against the testator's estate, and which the surrogate disallowed.

The surrogate excluded the claim from the accounts, on the ground that, as between the executor and testator, the executor was bound to have paid off and discharged the mortgage. I cannot entertain a doubt of the correctness of the decision. The mortgage was given at the request, and for the accommodation and exclusive benefit of the executor, and on his undertaking to pay it off. The history of its origin and the application of the moneys raised thereby, point only to this conclusion. The appellant, individually, and not as the agent of his father, applied to the company for the loan, that he might purchase the Watson mortgage, that was an incumbrance on his Broadway and Courtlandt-street property. The testator had no interest in such purchase, nor had he any occasion to borrow money for any purpose. The appellant induced his mother to create a lien upon her separate estate, and his aged and infirm father to consent to accompany the mortgage with his bond, to raise money for his exclusive benefit, on his undertaking to pay off and discharge the mortgage. Under the circumstances it seems very clear that the appellant was primarily liable for the amount of the mortgage. And this is the view he seems to have taken of it himself, until after his father's death, and a difficulty had arisen between him and others of legatees and next of kin, in respect to the administration of the estate of the testator.

The moneys he now seeks to charge against his father's estate, even in the lifetime of the latter, were paid by him individually, and not as the agent, or at the request of his father,

Moore *v.* Moore.

and he voluntarily reduced the lien on his mother's estate to seven thousand dollars, and repeatedly promised her that he would soon discharge it altogether. Instead of allowing the payments thus made in his account as agent, or executor, or as creditor of his father, I think that the estate of his mother is entitled to be relieved wholly from the lien. Besides, if it could be pretended, in view of the facts proved, that the moneys were paid in the character of attorney, or executor, it was incumbent on the appellant to show that they were paid on some valid claim against his father's estate. The presumption created by the fact of their being paid on the testator's bond, is rebutted by the other facts in the case. This bond (the appellant being the borrower of the money) was not a debt against the testator, for he, being only a tenant by the curtesy, was not bound to discharge the incumbrance on his wife's estate; the land constituted the primary fund. This money which the appellant paid, was in discharge of his own obligation to his mother, on the faith of which she assented to mortgage her property.

3. As to the claim for services as physician to the testator.

In October, 1843, four months after the death of the testator, the appellant applied to the orphans' court in New Jersey for leave to sell the the testator's real estate, to pay debts. The statutes of that State made it the executor's duty, on such an application, to exhibit under oath a just and true account of the testator's personal estate and debts, as far as he could discover the same. In compliance with the provision, he presented a sworn account of all the debts he was then able to discover against the testator. The account included a claim of the executor for services as the agent of his father, amounting to two thousand five hundred dollars; but none whatever for medical services was mentioned or referred to. If the latter claim existed at all, it existed then, and his omission to make it at that time is conclusive that he did not then consider that he had any claim; he solemnly declared under oath in effect that no such claim existed. The omission is not consistent, as urged by counsel, with the appellant having overlooked the claim; he did not overlook his claim as agent, which was much

the largest debt against his father in the account, and it is absurd to assign as a motive for his conduct that he had not then definitely resolved to assert his claim as physician.

If he knew, or supposed, that he had any just or legal claim, he was bound to assert it when called on, under oath, to state all the debts of the testator; and if he omitted to state any debt due to him for services as a physician, it was equivalent to an admission, in the most solemn way, that his father owed him nothing for any professional services he might have rendered, but that such services were gratuitous, and without any undertaking or expectation on either side, when being rendered, that any pecuniary recompense was to be made therefor. Yet, some six months afterwards, an account running through the years 1839, 1840, 1841 and 1842, for medical services, is trumped up, averaging the sum of eight hundred and twenty-five dollars per annum. Of course the precise time when the professional visits were made is not given (nor was there any attempt at any such kind of proof), as the appellant, though keeping books of account of services of a professional capacity, had no charge against his father on such books, for the reason, doubtless, that he had never regarded himself as visiting him in the character of a physician, or rendering any medical services with the intention of making any pecuniary charge therefor. Doctor Stephenson, of Hackensack, was the family physician, and attended the testator in that capacity before and after the latter became bedridden. Judge Moore, the testator, who had been an active man, began perceptibly to fail in 1838; but it was not until after a sort of apoplectic attack, in 1840, that he took to his room and bed. From that time, he was what Doctor Stephenson called a bedridden man, and a gradual prostration of mind and body went on until his death, in June, 1843. No remedies were given him, except of a strengthening nature, and no physician called, except when the family became alarmed at a slight recurrence or two of an attack similar to that which rendered him temporarily helpless in 1840. On the occasion of the attack in 1840, Doctor Stephenson consulted with the appellant in respect to his father's condition, when he expressed the opinion that the only ailment of the latter was old age, and that medical treatment was useless, as he was

broken down, and would die. The opinion was probably correct in the main; and there is no proof whatever that then, or any time afterwards, the appellant advised or suggested any medical treatment. But the testator did not die until three years afterwards; and then not from any acute disease, but from mere physical exhaustion.

During the years 1839, 1840, 1841 and 1842, the appellant, though residing in New York (twelve miles distant from his father's residence), was often at home. The aged parents seem to have reposed unlimited confidence in him, and always listened favorably to any suggestion for the advancement of his interests. In 1838 he had been intrusted by the testator with the entire management of his property in New York and New Jersey, with the exception of the homestead; and during the years in which the medical bill is alleged to have accrued, he received and disbursed, according to his own account, over twenty thousand dollars of the testator's funds. This agency occasioned frequent visits to Hackensack; so, also, the appellant was there frequently on business of his own; and it was a common occurrence, though having no special business, for him to visit home on Saturday and return to the city on the following Monday. Indeed, at times he would bring his carriage with him, and visit patients in the neighborhood, making his father's house his headquarters. In short, he was in the habit of visiting the country residence of his father whenever business or inclination dictated, and consulted nobody but himself as to the time of his arrival or departure. The month before the testator's death, he actually removed to Hackensack, being somewhat out of health, and became a member of the testator's family, continuing there some time after the death of the testator. In December, 1841, he induced his father to execute an agreement in writing, to allow and pay him five hundred dollars per annum for his services from the time he took charge of the testator's business, in 1838. The proofs utterly failed to show more than two or three instances where he was sent for by the testator's family to attend as physician; and, even in these cases, it is doubtful whether he was not rather summoned, with the other children, to attend the supposed dying bed of his father.

Moore v. Moore.

Undoubtedly, when at home, on the occasions referred to, during the three years that the testator was bedridden, he rendered much service, strictly of a professional nature. He attended his father's sick bed, and occasionally administered strengthening remedies, and, it may be, that the almost imbecile patient confided in him to a greater extent than in his regular physician; but it is very manifest, from the whole case, that the services were rendered and performed as acts of gratuitous kindness and affection, and that it was neither expected on the part of the father, nor intended on the part of the son, at the time of their rendition, that the latter was to be pecuniarily compensated. In December, 1841 (after two-thirds of his pretended medical bill had accumulated), instead of making any claim or demand for medical services, or intimating an intention to do so, he procured from his father an instrument in writing, agreeing to allow and pay him a salary of five hundred dollars a year of the testator's funds, which salary was allowed to him by the surrogate for five years, including the time of the running of the alleged medical account. The appellant made no charge in his books for any professional service rendered to his father, though every dollar of money disbursed, and every act performed as agent, was carefully noted. He made no claim or demand for compensation in the lifetime of the testator for professional attendance, but, on the contrary, assured his mother and the family that he had no such intention, giving them to understand that such services were rendered gratuitously.

After the testator's death he did not pretend to have any claim, but, in effect, declared in the most solemn manner that he had none. He should be held to his declaration, and not be permitted, in the exercise of a hostile feeling, engendered against his brothers and sisters, to saddle his father's estate with a debt for services that had been gratuitously rendered. Nothing is clearer than that the appellant did not intend at the time to make any pecuniary charge; nor was there any agreement or mutual expectation by himself, or his father, that he was to be paid for professional attendance, but the whole claim was an after-thought, urged and asserted only for vindictive purposes.

The appellant has never pretended that there was any agreement or understanding between his father and himself to pay for professional services. He places his right to recover on showing that he rendered meritorious and valuable services, which were accepted by the testator. Ordinarily, from the fact of the rendition and acceptance of services, beneficent in their nature, the law will imply a promise to pay what the services are reasonably worth. This implication may not be repelled wholly by the fact that the service is rendered to a parent by son of full age; but the legal presumption of an obligation to pay is less strong when the relation of parent and child exists, than in the case of dealing between persons not bound to each other. If, to the relationship, be added other circumstances, tending to show, as a matter of fact, that the services were gratuitously rendered, and without any expectation at the time on either side that payment was to be made, the law will not imply a contract for compensation. A person cannot perform services, intending them to be gratuitous, and with a tacit understanding that no pecuniary charge is to be made, and afterwards recover on a *quantum meruit* for such services.

In my judgment, this is precisely the character of the claim of the appellant for professional attendance. It was intended and understood, in the lifetime of the testator, that the services were gratuitous. It was so understood for months after the testator's death. The appellant virtually admitted in October, 1843, that he had no legal claim of the kind; and even in 1844, when his mother remonstrated with him as to his course, he justified himself,—not on the ground that there was any merit in his claim, but, having the law on his side, as he supposed, he meant to punish his brothers and sisters for their ill-treatment of him, by a personal appropriation of a large share of his father's estate, which rightly belonged to them. Surrogate McVean, in 1844, on the application to sell the testator's real estate, held this claim for medical services to be fictitious, and Surrogate Bradford, on the final accounting, reached the same conclusion. No intelligent or fair-minded judge, I think, can carefully examine the whole case, without cordially assenting to the justice and propriety of the decision. It can only prop-

erly be regarded as an unwarrantable attempt by the executor to make himself a creditor of his father's estate to a large amount, by the interposition of a claim for services that, at the time, were gratuitously rendered,—if rendered at all, to anything like the extent claimed.

The judgment of the supreme court should be affirmed, with costs.*

---

* In SHIRLEY v. VAIL (*March*, 1869), the question of the right of one to recover for services rendered to the person with whom she lived from childhood, as a member of his family, came before the court; but a majority of the court did not expressly concur in respect to it.

In that case, Mary Ann Shirley sued Daniel Vail, the executor of one Bennett, for compensation for services. The plaintiff went to live with the testator when about thirteen years of age, being left with him by her father, who thereafter removed from the State, and did nothing more for her; and her mother being dead. The testator was a farmer, and plaintiff lived in his family, "doing chores, milking, driving cows, and assisting in the housework," till about a year after she came of age. She was sent to school three or four winters. Plaintiff married and left the testator with her husband, in June, 1861. The testator died in 1865. This suit was brought in 1866.

The defense was, that the testator took her as a child, without any agreement to pay wages, but to board, clothe, and educate her, and that he stood to her in the place of a parent; and also, that if any one was entitled to payment for her services, it was her father, till her marriage, and, after that, her husband.

The plaintiff recovered, and defendant appealed.

*G. F. Comstock*, for defendant, appellant.

GROVER, J.—The court did not err in overruling the objection of defendant's counsel to the introduction of the plaintiff as a witness in her own behalf. She was a competent witness in the cause, and it was proper for her to be sworn as such. The court, in overruling the objection, did not decide anything as to what testimony it was competent for the plaintiff to give, but only that she should be sworn as a witness in the cause. There was no objection made to any testimony given by the witness, nor any ruling made by the court upon the competency of any part of it. No question upon that point can be entertained by this court.

There was evidence given tending to show that plaintiff's father had abandoned all claim to her services while a minor. He had consented to her going to live in the family of defendant's testator when she was thirteen years old, and shortly afterwards he removed to Wisconsin, leaving

## MORANGE *v.* MORRIS

September, 1867.

Affirming 34 *Barb.* 311.

Where the covenant to convey free from incumbrance, and the covenant
to pay the purchase money are mutual and dependent, the purchaser

---

the plaintiff in the family ; and after she went there to live, provided
nothing for her, and took no care whatever of her. Steel *v.* Dorr, 5 *Wend.*
205 ; and cases cited.

The motion for a nonsuit being predicated upon the right of the father
to recover for the services of the plaintiff, there was no error committed
by its denial.

The defendant's counsel requested the court, in substance, to instruct
the jury that the plaintiff could not recover, for the reason that she
went to live with the testator as a member of his family ; to be provided
for, brought up, and educated as such ; and that this relation continued
during all the time services were rendered by her for the testator.

The court refused to give the instruction requested, and the defend-
ant's counsel excepted.

If the evidence was such that a verdict, finding the facts different
from those claimed by the counsel, should be set aside as against evidence,
the judge erred in refusing to instruct the jury as requested.

It has been repeatedly held by the court, that it was error to refuse to
direct a verdict in cases when a finding contrary to the direction prayed
for would be set aside.

That the law is as was claimed by the counsel in his request upon the
facts stated by him, has been repeatedly held by the supreme court, and
settled by the determination of this court. Williams *v.* Hutchinson, 3
*N. Y.* (3 *Comst.*) 312 ; and cases cited.

The inquiry, therefore, is, whether the evidence established the facts
claimed by the defendant's counsel, or whether there was such conflict
as rendered it proper to submit the case to the jury.

John C. Bennett, a son of the testator, testified, that in the fall of the
year, plaintiff came to live in the family of the testator ; her father
came to his (the testator's) house, and while there had a conversation
with testator as to plaintiff's living there. That the testator stated to
him the terms : that she was to live there until of age, and that he was
to take care of her as a member of his family ; to send her to school,
and care for her as a child ; that her father assented to the terms, and
said that was as he understood it, and desired her to remain as a member
of the family.

It was proved that the plaintiff was about thirteen years old when she

may rescind and recover back his deposit of purchase money without proving a tender of the balance, if the vendor, by reason of incum-

---

went to live in the family, and that from that time the testator and his wife had the exclusive care of her, provided all her clothing, sent her to school as farmers' daughters usually were sent, dressed her in similar style, and that upon her marriage she had a cow, bed and bedding, and a box of clothing. That no accounts were ever kept by the testator with the plaintiff, nor, so far as appeared, by the plaintiff with him. That the testator lived upward of four years after the plaintiff's marriage, and after she left the family to reside with her husband, and that no claim against the testator for her services was made by the plaintiff during his life and for some time after.

This proof was met by the plaintiff's proof, that, at the time the testator took her from her aunt's, with whom she was then living, to go and live with him, he said he would do well by her; and that he said to his neighbors several times while the plaintiff was living with him, that the plaintiff was a good girl to work; that he did not know how he could get along without her, and that he would pay her well; facts, I think, quite, if not more consistent with the defendant's theory than that of the plaintiff.

The evidence that plaintiff milked and sometimes drove the cows to and from pasture, a distance of about thirty rods, occasionally fed calves that the testator was raising, and sometimes fed hogs, furnished no evidence that the testator expected to pay, or the plaintiff to receive, wages as a servant, to any mind acquainted with the services frequently performed by farmers' daughters in the country.

The testator's wife handing the plaintiff ten dollars about the time of her marriage, coupled with the remarks that she would pay her more but that was all she had then, was not evidence against the defendant, as there was no proof that the testator was present.

The testimony of plaintiff's husband, that the testator let plaintiff have a heifer, and said she would make a good cow, and that he let her have the cow for twenty dollars, but she must pay for her keeping, &c., was to my mind no more evidence of an understanding that plaintiff was at work for wages, and that the cow was delivered as partial payment, than it was of an existing demand of the testator against the plaintiff for the cow.

An examination of the testimony satisfies my mind that there was no evidence really in conflict with the strong proof of the defendant, tending to show that plaintiff lived with the testator, and was provided and cared for by him and his wife, as a member of his family, without any idea of paying or receiving wages otherwise; and that the judge erred in not instructing the jury as requested by the defendant.

The judgment should, therefore, be reversed, and a new trial ordered, costs to abide event.

brances on the land, was not prepared to make title as required by the contract.*

Though the incumbrances be only taxes and assessments, if the vendor does not cause them to be discharged, the purchaser is not bound to accept title ; and his objecting to accept title on another and insufficient ground does not waive this objection.

---

JAMES, WOODRUFF and DANIELS, JJ., also were of opinion, that there was no sufficient evidence of a right to wages under the circumstances under which the plaintiff lived with the testator as a member of his family.

MASON and HUNT, JJ., also were for reversal, but on the ground that there was no sufficient evidence of emancipation ; and hence, that if a right to wages were shown, it was in the father, and he alone could recover.

Judgment reversed, and new trial ordered, costs to abide event.

Compare *L*. 1850, p. 579, c. 266, which enacts that where a minor goes to service, the payment of wages may be made to the child, unless the parent or guardian gives notice. ———