EXECUTORS—CLAIMS FOR SERVICES RENDERED DECEDENT—FAMILY RELATIONSHIP.

　　The claim of a nephew against the estate of his uncle for board and care furnished the latter will not be allowed, where the deceased made his home with the claimant for some two years, on his repeated invitation, without any agreement to pay for board, and the only evidence of a subsequent agreement is the testimony of a son of the claimant, while, on the other hand, the facts that no payment was máde or bill rendered during the lifetime of the decedent, and that he left unchanged a will previously made, by which he divided his estate, which was small, between the nephew and a niece, charging it with a specific legacy to the one who should have had the most care of him, with other circumstances, tend to show that he did not understand that any charge was to be made.

Judicial settlement of account of Benjamin F. Jones, as executor of the will of William Jones, deceased. Hearing on claim of executor for services rendered decedent in his lifetime. Disallowed.

　　Frank H. Osborn and Sidney Crowell, for executor.
　　Bloodgood & Talmadge, for Sarah E. McCoon.

SANDERSON, S. Benjamin F. Jones, executor of the will of William Jones, deceased, presents, on the judicial settlement of his account, a claim against the testator amounting to $865.25; being all, with the exception of $3, for the board and care of William Jones from May 5, 1895, to March 16, 1897, the date of his death. Sarah E. McCoon, who is the sole legatee named in the will of William Jones, besides Benjamin F. Jones, objects to the allowance of said sum of $865.25, for the reason that the claim is illegal and unjust, and not a proper charge against the estate of the testator. By the will of William Jones, one-third of his estate, after the payment of a legacy of $100, is bequeathed to Benjamin F. Jones, and two-thirds is bequeathed to Sarah E. McCoon. The estate is a small one. The executor charges himself with $1,767.83. He credits himself with the payment of funeral expenses, expenses of administration, and debts, $351.94; leaving a balance of $1,415.89, to be distributed on this accounting. Commissions and expenses of this accounting are to be deducted before any payment can be made to the legatees. It

is obvious that, if the claim of the executor is allowed as made out by him, the legacies will be very small. If, however, the claim is just, it should be allowed and paid before any payments can be made to the legatees.

Benjamin F. Jones is a nephew of William Jones. Sarah E. McCoon is a niece of the deceased wife of William Jones, and lived in his family from infancy to the time of her marriage, which took place when she was 18 years of age. She called him "father." He stood, therefore, in loco parentis to her. The wife of William died many years ago. When Mrs. McCoon married, William sold his farm and moved to the home of his brother, Milton Jones, not far from his former residence, where he was living at the time his brother died. Milton Jones died January 20, 1895, and was buried January 23, 1895. The next morning after the death of Milton Jones, Theodore Jones, a son of Benjamin, went to the house of the deceased, where he found William Jones crying. "I don't know what will become of me," he said. "I have nothing to help myself with. I think I will have to go to the poor house." Theodore said to him, "Uncle William, I think you can have a home with father." William replied: "I can go with McCoon, but I don't want to go there. They will depend on me to pay my board, and buy everything they have in the house, and I have nothing to do with." Theodore said: "I will go and get father and bring him up here, and you can have a conversation with him." Theodore hitched up his horse and brought his father there. The father said to William: "You can have a home with me as long as I have one." William replied: "I want to go to Hunter and make Sadie a visit, and then I am coming to make my home with you." By "Sadie" is meant Mrs. McCoon. The above is an extract from the testimony of Theodore Jones on his direct examination. On his cross-examination he said: "I had a talk with William Jones the day after Milton's death. He was crying. He said he didn't know what would become of him; he guessed he would have to go to the county house, or to the poor house. I said: 'There is no use of you feeling like that. I think you will be welcome to have a home with father.' He said: 'I can go to McCoon's, but I don't want to. They will depend on me to pay my board and support them, and,' he said, 'I have nothing to do it with.'" This witness further testifies on his cross: "There was a conversation had there on that day between William Jones and his father, in which Benjamin said to William that he could go to his house and have a home the same as he had." Nothing was said about pay, so far as the witness heard. "William said he would go up and make a little visit at McCoon's, and then he would come and make his home at father's." There is no evidence that shows what kind of a home William had at Milton's. I think it would throw some light on this case if we had such testimony, and help explain what Benjamin meant when he said that William could have a home with him, the same as he had. We have nothing to draw an inference from, except that William's circumstances were very poor. Mrs. McCoon, who was a witness in her own behalf, said that, on the day of the funeral of Milton Jones, Benjamin asked William to go down there,

and wanted to know when he would go down. William told him that he didn't know; that Mrs. Milton Jones wanted him to stay there after her husband died. Benjamin said he would like to have him come and make his home with him; he was welcome to come and stay. Benjamin denies the truthfulness of other important testimony given by Mrs. McCoon, but he does not deny that this conversation is correctly stated by her.

I have been careful to state quite fully the conversation that took place at Milton Jones' between William and Benjamin, for the reason that it is the origin of the family relation which they sustained towards each other during nearly the whole remainder of William's life, and also because it aids in the solution of the problem in hand: Did Benjamin Jones at that time intend to charge William for his board and care, or did he intend to furnish them gratuitously? William was crying because he said he had nothing to do with, and would have to go to the poor house. He did not want to go to McCoon's, because he would have to pay for his board, and also for their support. The McCoons were in poor circumstances, and could not afford to support him without pay. At the time of the death of Milton Jones, William Jones was possessed of very little property. He held a note against C. E. Lake and others for $400, and that seems to have been the extent of his possessions. This state of things explains why William said on the morning after his brother's death: "I don't know what will become of me. I have nothing to help myself with. I think I will have to go to the poor house." When Theodore Jones said, "There is no use of feeling like that: I think you will be welcome to have a home with father;" and when Benjamin said to William, "You can have a home with me as long as I have one," or, "You can go to my house and have a home the same as you had,"—neither Theodore nor Benjamin could have had in mind that William was coming to his nephew's house as a boarder; and least of all could William have supposed that such was the case. He did not use the language that he did for the purpose of procuring a boarding place. Although he told them he had nothing, the invitation was to have a home at Benjamin's as long as the latter had one. The testimony of Mrs. McCoon as to what was said by Benjamin to William on the day of the funeral is to the same effect. On other occasions, also, at the house of the McCoons, Benjamin invited William to his house. At the time of the funeral of Milton Jones the contents of his will were not known, but in June, 1895, William received from the estate of his brother $1,700. The estate of William was inventoried at a little less than $1,700. The remark attributed by Theodore Jones to William, that he did not want to go to the McCoons because he would have to support them besides paying for his board, is a strange remark to make, if he did make it. There is nothing in the testimony that justifies so harsh a remark. He had a high regard for the McCoons,—especially for Sadie. A few days after Milton's funeral, he went to Sadie's, and stayed there for more than three months, during half of which time he was sick, and all the while in an enfeebled condition. He visited the McCoons three other times during the remaining two years, or nearly so, of

his life; spending seven weeks' further time with them. Mrs. Benjamin Jones says that William visited the McCoons only twice, or only three weeks in all, after May, 1895; but the preponderance of testimony is in favor of three visits, and that the time occupied was seven weeks. Mr. and Mrs. McCoon thus testify. They are very clear and definite upon this subject, while the statements of Mrs. Jones and Theodore Jones are unsatisfactory. William H. Brandow, whose means of knowing were of the best, testified that William visited the McCoons three times; the last visit having been made in June, 1896. The testimony fails to show that on either of these occasions William paid for his board, or supported the McCoon family. The testimony shows that whatever pecuniary obligations he did incur he was very prompt in discharging. That he was attached to the McCoon family is evident, not only from the length and frequency of his visits, but from his paying a claim against Mr. McCoon of $45, without being requested to do so, and without his knowledge until he heard of it afterwards. He also made a present of $12 to Mrs. McCoon. What inducement moved him to these acts of kindness does not appear. Presumably, they were prompted by his regard and affection for these poor people. The fact that a bill of Mr. McCoon for the board and care of William has been presented to the executor is not inconsistent with the view above taken. It is not to be wondered at that Mr. McCoon should think he is entitled to be paid if Benjamin is. If Theodore's testimony is true, William knew that he would have to pay board if he went to McCoon's, and there is nothing in their relationship which would forbid such an agreement or understanding. Theodore's statement goes far to support the claim of Mr. McCoon. Moreover, counsel for the McCoons has stated in open court in this proceeding that, if the claim of the executor for board and care be disallowed, the claim of Mrs. McCoon as assignee of the bill of Mr. McCoon will be withdrawn. Besides, there is nothing in the testimony that shows that William bought everything that the McCoons have in their house, or supported them. If Theodore has correctly stated the words of William, the inference to be drawn from the first part of William's conversation and from the invitation given by Benjamin is not changed. Benjamin was not present at the conversation had between William and Theodore, and it does not appear that Benjamin had been informed as to what William had said about the McCoons. On the contrary, William told Benjamin that he was going to make Sadie (meaning Mrs. McCoon) a visit. Even Theodore's remark that he thought William would be welcome to have a home at his father's was made before William had said anything about the McCoons.

A few days after the funeral of Milton Jones, William went to the house of Mr. and Mrs. McCoon, where he stayed until May 5, 1895. Shortly after his arrival at the McCoons, he had a stroke of paralysis, from which he never fully recovered. He had previously suffered from two slight attacks of the same trouble. After he got around again from this last attack, he is spoken of as a broken-down old man. The last attack affected him on the left side. His left hand and arm became almost useless. He was at this time 72 years of age, and had

long been bent in form. He was, however, a very kind and pleasant man, making as little trouble for others as possible, and would often suffer rather than make known his wants. Benjamin Jones was in fairly good circumstances. He owned a farm, entertained travelers, and kept a store where he sold tobacco and cigars. Chester McCoon testified that on the 10th of March, 1895, or about that time, while William was staying at his house, Benjamin called on him, and told him "that he was perfectly welcome to come down there and stay as long as he lived, and he would not charge him one cent for his board." William, Benjamin, and Mr. and Mrs. McCoon were the only ones present on this occasion. A few days after this, at the same place, Benjamin told William that he (William) had paid $100 to his own father for his services before he (Benjamin) became of age, and as long as he had a home he was perfectly welcome to come and stay and live with him. William said he would try and come down as soon as he conveniently could. William, Benjamin, Mr. and Mrs. McCoon, and Esther Brandow were present on this occasion. Mrs. McCoon states that at her house, the last of February or the first of March, Benjamin asked William when he was coming down there. "Father [meaning William] said he didn't know. Father asked him how much he was going to charge him for his board. Benjamin told him not to worry about that; that he was perfectly welcome to come and stay as long as he wanted to; he didn't want anything for his board." On her cross-examination she adds that William said he would rather set a price; that it would be more satisfactory, or something like that. Benjamin Jones denies that the conversations at McCoon's house, as testified to by Mr. and Mrs. McCoon, took place. He says that he told William, when he got ready to come down, to let him know. The testimony shows that the hearing of Mrs. McCoon has been very much impaired for four or five years. At the hearing before me her deafness was very apparent. She claims that her hearing was much better three or four years ago than it is now. While William Jones was visiting at the McCoons, on the 18th of February, 1895, he made his will, wherein he gave $100 to Mrs. McCoon or Benjamin F. Jones, whichever should have had the most care of him. The residue of his estate he gave to Mrs. McCoon two-thirds, and to Benjamin Jones one-third. This legacy of $100 is a circumstance tending to show that William did not expect to pay for his care and keeping at whichever place he should live. It is not reasonable to suppose that, with so small an estate as William possessed, he would pay for his care twice to the same person. The only testimony we have of an express agreement between William and Benjamin that William was to pay for his board is that of Theodore Jones. William was brought from McCoon's to Benjamin's house by Theodore on the 5th of May, 1895. On that day, or a few days afterwards, Theodore testifies, he heard William ask Benjamin "what he was going to charge him for staying there." Benjamin said: "Uncle William, you are in a condition that you may need all the money that you have got. As long as you are as you are now, let everything go as it is; but, when you are done, then, if there is anything left, I want my pay."

William said: "I have always paid my way wherever I have been, and I shall pay you." On his cross-examination in reference to this conversation, Theodore testified as follows: "William says: 'I want you to tell me what you are going to charge for keeping me.' Father says: 'You are in a condition that you need all that you have got to take care of you, and you let everything go just as it is; and then, when you are done, then, if there is anything left, I want my pay.' And he says: 'I have always paid my way wherever I have been, and I shall pay you.' That was all that was stated." After that William never offered, in the presence of this witness, to pay Benjamin anything, or said that he ought to pay him. William, Benjamin, and Theodore were the only persons present on this occasion. Theodore also testified that he would not say, within a month, how long it was after William came to his father's house that this conversation took place. This conversation is important, if true, and fixes the liability of William's estate, if it is to be believed. It is not in harmony with the conversation that took place at Milton Jones' house in January previous. It is inconsistent with the conversation that was had between William and Benjamin in March of the same year, as testified to by Mr. and Mrs. McCoon. It is not probable that both conversations took place as stated. The witnesses are closely related to the parties in interest. The testimony of Mrs. McCoon and of Benjamin Jones, where they are in conflict, may be disregarded. Mr. McCoon is the husband of the contestant, and Theodore is the son of the claimant. Without help from other sources, it is a pretty even debate as to which one ought to be believed. The burden, however, is on the claimant to make out his case by a preponderance of proof.

We must resort to circumstantial evidence or indirect proof in order to determine whether William's estate is liable for the payment of the executor's bill. Where the positive evidence in a case is not satisfactory, circumstantial evidence bearing upon the main point at issue becomes a very important help in removing the difficulties in the way. About the time of the conversation between William and Benjamin, at the house of the latter, as testified to by Theodore, this witness says that William said: "Phœbe, you have an awful task in doing my washing. I have always paid Sadie McCoon and Lou Holcomb twenty-five cents a week for doing my washing, and there were no such dirty clothes as these, and you ought to have more. You keep track of the washing, and I will pay you for it." If Theodore's testimony is true, an agreement had already been made for keeping William, and for his staying there. These words "staying" and "keeping" include, not only board, but care and washing. It would seem quite out of place, in a person of William's moderate circumstances, that he should agree to pay twice for his washing. The answer that Benjamin gave to William's question is evasive. He does not tell him what he is going to charge him for staying there. The whole matter is postponed until after William's death, and then all charges for board, care, and washing can be brought in against his estate, without being limited by an agreed-upon price. The evidence shows that William never paid Mrs. Jones

anything for washing, although he lived in the family with her nearly two years after this alleged conversation. There is no evidence to show that she ever presented him with a bill, or asked him for money. Another circumstance bearing upon the main question in this case is the provision in William's will for the payment to Mrs. McCoon or Benjamin Jones of $100, to be paid to whichever one had the greatest care and trouble in caring for him. This will was made on the 18th day of February, 1895, within a month of the death of Milton Jones, and of the conversation had at his house between William and Benjamin. This provision is in harmony with the view here taken of that conversation, viz. that William understood that he was not to pay for board at Benjamin's house. Therefore, it was very reasonable that some provision should be made in his will for the trouble William might give in caring for him, in addition to the legacies that were left to Benjamin and Mrs. McCoon. If the arrangement for his staying at Benjamin's had been changed from that of a home to that of a boarding house, is it not reasonable to believe that William would have made a change in his will, so as to avoid paying twice for the same thing? William lived more than two years after executing his will, without making any change in it. This provision in his will is a circumstance tending to show that William did not at any time believe that he was living under an agreement to pay for his board and care. Another circumstance bearing upon this question is that it was by invitation from Benjamin that William went to his nephew's to live. William did not ask permission to become a member of Benjamin's family. In many cases this is regarded as an important circumstance. The invitation was given at the house of Milton Jones, and was repeated at the house of Mr. and Mrs. McCoon. While Benjamin denies the truthfulness of a large part of what Mr. and Mrs. McCoon say as to the conversation that took place at their house, he says himself that he told William, while he was at McCoon's, that when he got ready to come down, to let him know. This testimony shows, or tends to show, that the invitation which had been given to William at the house of Milton Jones was still open to him. It is much more reasonable to believe that if William went to Benjamin's to live as a boarder, and not as one of the family, without charge for board, he would have made an arrangement, before he went there to live, as to the price he was to pay for board, rather than wait until he had moved into Benjamin's house. This is the course usually pursued by persons looking for a boarding place, and the price of board was specially important for William to know, in his restricted, and, as he supposed, impoverished, pecuniary condition. The relationship which existed between William and Benjamin is not without weight in determining the existence of an implied contract for the payment of board. In 2 Pars. Cont. *46, the rule is thus stated:

"In general, wherever service is rendered and received, a contract of hiring, or an obligation to pay, will be presumed. But it is said not to be so where the service is rendered to the parent or uncle, or other near relative of the party, on the ground that the law regards such services as acts of gratuitous kindness and affection."

These remarks of Parsons are cited in Re Stevenson, 86 Hun, 325, 328, 33 N. Y. Supp. 493. In this case the relationship is that of uncle and nephew. In Williams v. Hutchinson, 3 N. Y. 312, 317, the law upon this subject is thus stated:

"The parent is not legally entitled to the custody or earnings of his children after they arrive at the age of twenty-one; nor is he entitled to the earnings of, or bound to maintain, his nephews or nieces; yet if they live with him as members of his family, without any contract or understanding that he shall pay for their services or receive pay for their maintenance, the law will not imply a promise to pay on either side."

In Wilcox v. Wilcox, 48 Barb. 327, 329, the court says:

"The law will not imply a promise to pay for board or services, as among members of the same family and persons more or less intimately or remotely related, where they are living together as one household, and nothing else appears."

Abb. Tr. Ev. p. 359, states, in substance, that the relation of nephew and uncle raises a presumption that no payment was to be made, beyond that received by the claimant at the time.

Jagau v. Goetz, 11 Misc. Rep. 380, 32 N. Y. Supp. 144, is a case very much in point, or would be if the statute of limitations had not been raised as one of the defenses. In that case the plaintiff was the nephew of the defendant's husband, and had been living at the defendant's ever since he came to this country, when a mere lad. The court says:

"The plaintiff being in defendant's family as a portion of it, the promise or understanding to pay him wages was necessary, as, without some understanding between parties bearing such relation, no agreement to pay for the services rendered would be implied, and no action would lie."

The executor in this proceeding principally relies upon In re Duffy, 19 Misc. Rep. 92, 43 N. Y. Supp. 970. The claimant was a niece of the testatrix, and rendered valuable services to her aunt in boarding and caring for her for seven years during the latter part of her life. There was no express agreement to pay, but there was an expectation on the part of the claimant that she would be remunerated by a provision in the testatrix's will. There was also an intention on the part of the testatrix to compensate her in this way. Claimant was made residuary legatee in her will, but the estate was exhausted by the general legacies, and there was nothing for the residuary legatee to receive. We have here an expressed intention to pay, but a failure to do so. It may be that a question of fact arose that would bring that case within the principles laid down in Robinson v. Raynor, 28 N. Y. 494; Collier v. Rutledge, 136 N. Y. 621, 32 N. E. 626. A contract, express or implied, could be inferred from the provision of the will, which remained unchanged, the same as if the testatrix had made and delivered her note. The residuary legacy in Duffy's Case, although it shows an intention to pay, was not an effectual provision, and the liability would still remain. The surrogate before whom that case was tried took another view of the case, using the following language:

"The law implies an intention on the part of the testatrix to pay for valuable services rendered to her with her knowledge and consent. Thus we obtain the necessary element of contract. The relationship is not sufficiently

close to bring this case within the rule that a contract to pay will not be implied."

The other cases cited upon claimant's brief, viz. Woodward v. Bugsbee, 2 Hun, 128, Bradley v. Bradley, 48 N. Y. St. Rep. 490, 20 N. Y. Supp. 452, and Markey v. Brewster, 10 Hun, 16, are cases where there was proof of an express contract, or of circumstances from which an implied contract might be inferred, and do not state the general rule.

I'will assume the law to be that, where the relationship of a person taken into a family is that of an uncle, this alone will not repel the presumption that his board is to be paid for. It is a fact, however, which casts suspicion upon the validity of a claim of this kind. It tends to rebut the presumption, and is to be taken into consideration with the other circumstances in the case, in determining whether the presumption is overcome. The fact that the contract between William and Benjamin, as testified to by Benjamin's son, was not to be performed on William's part until after his death, casts grave suspicion upon the existence of such a contract, and cannot be established without clear and satisfactory evidence. In Gaylord v. Gaylord, 7 N. Y. St. Rep. 703, the court says:

"Alleged oral dispositions of estates, to take effect in the future or after death, should not be found or supported unless established by abundant evidence, of the most satisfactory and convincing character."

More forcible and more at length is the language of the court of appeals in Shakespeare v. Markham, 72 N. Y. 400, 403:

"Contracts claimed to have been entered into with aged or infirm persons, to be enforced after death, to the detriment and disinheriting of lawful heirs, who otherwise would be entitled to their estates, are properly regarded with grave suspicion by courts of justice, and should be closely scrutinized, and only allowed to stand when established by the strongest evidence. More especially should this rule prevail when the contract is not in writing, rests entirely upon parol testimony, which is not very precise and somewhat uncertain, and is directly in conflict with the will of the deceased, executed some time before the agreement claimed was entered into, and which remained unrevoked at the time of his decease."

In the case in hand, the estate would be more than half consumed if the executor's claim be allowed as presented, and, if the testator had lived two years longer, at the same rate of charge by Mr. and Mrs. Benjamin Jones, the estate would be insufficient to pay the claims. We are asked to accept this contract as proved upon the uncorroborated testimony of the claimant's son. If, on the other hand, the claimant rests his case on an implied agreement to pay the reasonable value of decedent's board and care, he is met by the difficulty that no bill for board or care was ever presented by the claimant during the lifetime of the testator, and that no payment was made on account. This also is a circumstance to be considered in determining whether the presumption of an implied contract that decedent should pay for his care and board has been overcome. Says the court of appeals in Kearney v. McKeon, 85 N. Y. 136:

"Claims withheld during the life of an alleged debtor, and sought to be enforced when death has silenced his knowledge and explanation, are always to be carefully scrutinized, and admitted only upon satisfactory proof."

In speaking of this class of claims, the surrogate of New York has well said in Bowen v. Bowen, 2 Bradf. Sur. 336:

"Demands of this character are not unusual in administration cases; and, as the party who had the best means of controverting them has been removed by death, they are not to be regarded with any favor, especially where the claimant has allowed his claim to sleep during the lifetime of the decedent. In all cases of this kind, the evidence should be very clear that the services were performed by the claimant, expecting to be paid for them, and that the decedent so understood it, or had reason to believe that he was to be charged therefor."

The unsupported testimony of claimant's son is not such clear and satisfactory proof of an express contract as to overcome the suspicious circumstances connected with the claim. In Hughes v. Davenport, 1 App. Div. 182, 184, 37 N. Y. Supp. 244, the court says:

"The rule that a fact testified to by a disinterested witness, who is not discredited, which is not in conflict with other evidence, is to be taken as legally established, and cannot be disregarded by the court or jury, is not applicable to this class of cases."

On the whole case, the executor has not proved his claim to the satisfaction of this court, within the rules of law applicable to this class of cases. Winne v. Hills, 91 Hun, 89, 92, 36 N. Y. Supp. 683; Van Slooten v. Wheeler, 140 N. Y. 624, 633, 35 N. E. 583. If the executor has suffered harm by reason of the application of the rules of law to the evidence in this proceeding, he has himself alone to blame for it. The difficulty in proving his claim could easily have been obviated, either by a written contract, or by some other method that would have furnished satisfactory proof of his right to compensation. Forbes v. Chichester, 30 N. Y. St. Rep. 370, 8 N. Y. Supp. 747. On the other hand, if, as the evidence shows, it was the intention of claimant to furnish a home for his uncle without charge, he cannot now, however meritorious his services, recover, on a quantum meruit or otherwise, for his services and acts of kindness. Moore v. Moore, 3 Abb. Dec. 303, 312.

For the above reasons the claim of the executor to compensation out of the estate of the decedent for the board and care of said decedent is disallowed. Decreed accordingly.