In the Matter of the Petition of THEODORE EVERNGHIM BLAKE and Others, to Render and Settle Their Accounts as Executors etc., of LEWIS DUNCAN MASON, Deceased.

Surrogate's Court, Kings County, October 15, 1929.

*C. Elmer Spedick*, for the petitioners.

*Gross & Keck* [*Frederick A. Keck* of counsel], for the claimants.

*John J. Fitzgerald*, special guardian for Evernghim Blake and others, infants.

WINGATE, S. The problem here presented concerns the propriety of certain claims against the estate of Rev. Lewis D. Mason, M. D., who died on June 11, 1927, and whose will was duly admitted to probate in this court on the 20th day of September, 1927. These claims are for personal services alleged to have been rendered to decedent and are presented on behalf of Rev. T. C. Roberts-Horsfield, and his wife, Mrs. Emily Roberts-Horsfield. Mr. Horsfield's claim is for services as " companion, secretary, attendant, etc.," and covers the period from April 1, 1912, to the date of Dr. Mason's death, while that of his wife is for services as housekeeper and nurse from August 1, 1920, to June 11, 1927. The claimants were in no way related to the decedent.

The present controversy differs in no material respect from the usual case of this type presented to Surrogates' Courts for determination, except in the volume of testimony adduced on behalf of the claimants and in the painstaking care displayed by all the counsel in prosecution and defense. No less than twenty-nine witnesses were introduced, and the trial, which occupied six days, yielded a record of 566 pages, the briefs of counsel covering an additional 171 pages.

While the basic legal principles controlling cases of this type have been frequently enunciated and are well established, a few

typical examples of the statements of these rules will be helpful in clarifying the questions involved.

In *Ward* v. *N. Y. Life Ins. Co.* (225 N. Y. 314) the Court of Appeals says (at p. 322): " The rule in any civil case is that the plaintiff must establish his claim by a fair preponderance of evidence. He need do no more than this if his claim deals with a dead person; he cannot do less if he is attacking the rights and property of a living person. The general rule as to weight and quality of evidence is no different in one case than in the other. In applying the rule and test to specific evidence, however, it very likely will and should occur that the triers of fact will more carefully and critically scrutinize evidence offered against a dead person's estate for the purpose of deciding whether it does make the necessary weight and preponderance of evidence, than would be done if the testimony was offered against one who was alive to contradict it."

In *Mc Keon* v. *Van Slyck* (223 N. Y. 392) the court, after reiterating this rule in substantially identical language at page 397, continues (at p. 398):

" There is no rule of law that the claimant's contract must be in writing, or even that it must be made out in all substantial particulars by disinterested witnesses * * *.

" In the instant case the jury might properly have been instructed that they could reject the testimony though uncontradicted unless they found it clear and convincing. They might even have been instructed that they could in their discretion reject it if it was not corroborated in all substantial particulars by disinterested witnesses. But they could not properly be instructed that such corroboration was essential as a matter of law, or that the law, irrespective of circumstances, viewed the claim with suspicion."

To like effect, see *Caldwell* v. *Lucas* (233 N. Y. 248, 254); *Collier* v. *Rutledge* (136 id. 621); *Matter of Wood* (207 App. Div. 41, 43).

It is a fundamental principle of law that where one person renders, and another accepts, service, the law presumes a promise on the part of the person benefited to pay for such service. This doctrine was first clearly stated in a case involving facts similar to those here present in *Moore* v. *Moore* (3 Abb. Ct. App. Dec. 303), in which the court says (at p. 312): " Ordinarily, from the fact of the rendition and acceptance of services, beneficent in their nature, the law will imply a promise to pay what the services are reasonably worth. This implication may not be repelled wholly by the fact that the service is rendered to a parent by a son of full age; but the legal presumption of an obligation to pay is less strong when the relation of parent and child exists, than in the case of dealing between persons not bound to each other. If, to the rela-

tionship, be added other circumstances, tending to show, as a matter of fact, that the services were gratuitously rendered, and without any expectation at the time on either side that payment was to be made, the law will not imply a contract for compensation. A person cannot perform services, intending them to be gratuitous, and with a tacit understanding that no pecuniary charge is to be made, and afterwards recover on a *quantum meruit* for such services."

The rule here stated has been uniformly followed in the courts of this jurisdiction. Thus, in *Matter of Hamilton* (70 App. Div. 73; affd., 172 N. Y. 652) the court says (at p. 76): " It is a general rule that where the relation of the parties is of such a character as repels the presumption of a promise to pay for service rendered, it will be presumed that the service was intended to be gratuitous."

The Appellate Term, First Department, in *Elesser* v. *Mead* (197 N. Y. Supp. 145), further clarifies the law in commenting on the last cited decision by saying (at p. 146): " The rule, however, as laid down in that case and others, does not bear this interpretation. It is rather that the *prima facie* implication of the right to compensation may be rebutted by proof of relations or circumstances which render it inapplicable. The mere fact that the parties are brother and sister may be one element in the line of rebuttal, but, standing by itself, it is far from conclusive."

Additional cases applying this rule of presumption are *Copeland* v. *Dunn* (164 App. Div. 904); *Penfield* v. *Penfield* (155 id. 177); *Matter of Chafee* (122 Misc. 768); *Matter of Grogan* (82 id. 555); *Matter of Eno* (61 id. 594).

There is in reality nothing in cases like the one under consideration which should cause courts to vary the well-established rule, that " while it is elementary that the law implies a promise to pay for work performed at the request of another, it is equally elementary that the law implies this promise from the presumption that a reasonable man expects to pay for work that he requests another man to do. This presumption may be rebutted by proof that both parties contemplated that the work was to be done without remuneration, or that the workman as a reasonable man should from the circumstances have realized that the other party did not expect to pay for the work." (*Alexander* v. *Automatic Mail Delivery Co.*, 123 N. Y. Supp. 976, 977.)

From the foregoing, it will be apparent that the statement of counsel that in a case like the present there is no presumption that the services were rendered gratuitously, while literally true, is an extremely misleading exposition of the state of the law.

A more correct declaration of the principle involved would be

that whenever beneficent services have been rendered and accepted the law presumes that the person benefited is liable to pay therefor. This presumption is not conclusive, but is sufficient to throw upon the person contesting such liability the burden of going forward and showing either that the parties agreed that the services were to be gratuitous or that the circumstances surrounding the transaction were such that no reasonable person would expect payment. This rule is equally applicable whether one or both of the parties are alive or dead.

The basis of recompense, in the absence of a special contract in cases where payment is proper, is also so well settled in law that an extended citation of authorities would be redundant in the extreme. In all such cases the recovery is based upon the reasonable value of the services rendered. (*Smith* v. *Long Island R. R. Co.*, 102 N. Y. 190; *Leahy* v. *Campbell*, 70 App. Div. 127, 130; *Matter of Wood*, 207 id. 41, 45; *Matter of Funk*, 49 Misc. 199, 200; *Chambers* v. *Sterling Automobile Mfg. Co.*, 163 N. Y. Supp. 574, 576.)

It must, therefore, follow in cases like that here presented, where the making of a special contract to pay the reasonable value of the services is alleged, that the fact of whether or not such contract was actually made is substantially immaterial. If made, it would amount merely to a formal recognition by the parties of what the law presumes. If not made, the legal effect of the acts done would nevertheless be recognized, and in either event only such recovery could be had as was commensurate with the value given and received. (*Robinson* v. *Raynor*, 28 N. Y. 494, 496; *Sturtevant* v. *Fiss, Doerr & Carroll Horse Co.*, 173 App. Div. 113, 115; *Leahy* v. *Campbell*, 70 id. 127, 130; *Chambers* v. *Sterling Automobile Mfg. Co.*, 163 N. Y. Supp. 574, 576.) (See, also, *McKeon* v. *Van Slyck*, 223 N. Y. 392, 399.)

This brings us to a consideration of the facts disclosed by the record. The claim of Rev. T. C. Roberts-Horsfield is divided into three periods, *first*, between April 1, 1912, and August 1, 1920; *second*, between August 1, 1920, and January 1, 1922; and, *third*, between January 1, 1922, and June 11, 1927. During the first period he claims compensation at the rate of $125 a month; during the second at $200 a month, and during the third at $75 a week.

The composite picture of the transactions involved may be deduced from the testimony, to the following effect: Dr. Mason and Mr. Horsfield were both ordained clergymen interested in home missions, the prohibition movement and allied causes, and had for many years been close friends and coworkers in these activities. In 1912, at the beginning of the period in question, Dr. Mason was about sixty-nine years of age, according to one of

the petitioners' witnesses, while Mr. Horsfield was some twenty-four years his junior. Their long and close association is also demonstrated by the fact that for a period of several months, about the year 1906, Mr. Horsfield and his family resided at the doctor's house. It does not appear on what basis this joint residence began, or was continued. In any event, it was discontinued at or prior to October, 1908, at which time a nephew of Dr. Mason came to the latter's residence, and his wife, Mrs. Ruth T. Blake, presided over its management with the aid of servants.

Mr. and Mrs. Horsfield during the following years, up to August 1, 1920, occupied their own house in the Flatbush section, where they resided with their three children, who gradually married and established homes of their own.

The chief activity of Mr. Horsfield up to 1920 appears to have been in the home mission field, it appearing that from about Labor Day in each year until around Memorial Day in the next he spent every evening, except Thursday, at the Tillary Street Mission from seven forty-five until eleven P. M., and during the balance of the year pursued similar activities in connection with a mission at Coney Island. In addition to this, it appeared from the testimony of claimant's son that this missionary work occupied a more or less indefinite, additional amount of his time, and that he might be called upon to visit the sick or needy or attend to some other matter connected with this work during the day. It affirmatively appeared that he never received any remuneration whatsoever for his mission work. In addition to his missionary and religious activities, Mr. Horsfield, up to 1922, was employed as a salesman by the Reed Brass Manufacturing Company. Claimant's witnesses who testified on the subject did not entirely agree among themselves as to the amount of time which he was compelled to devote to this business. Although some testimony was elicited of day and over-night trips to visit customers, the weight of testimony indicated that most of his business was done with personal friends and acquaintances by mail or telephone, and that aside from this, or possibly including it, his business did not entail the use of more than an average of about two hours a day.

About the year 1911 Dr. Mason underwent an operation, the nature of which does not clearly appear from the testimony. Its effect upon his physical condition was the subject of much contradictory testimony, some of the witnesses testifying that he became permanently enfeebled and half blind, while others maintained that he shortly returned substantially to the state of health which might be expected of a man of his age and previous general physical condition.

At all events, shortly after the operation, he entered into some sort of an arrangement with Mr. Horsfield, by which the latter's desk was removed from its previous location at the office of the mission to Dr. Mason's home.

The services during the period between the time when this event occurred and the start of the second period, on August 1, 1920, were attempted to be proved largely by ten witnesses, namely, claimant's wife, son and two daughters, and the witnesses Mrs. Clark, Dr. McGill, Mr. Pilsworth, Mr. Fisher, Mr. Scott and Mr. Rauch.

The alleged services of the claimant during this period are summarized by his counsel as consisting in taking the doctor. to the mission every Friday evening; attending and accompanying him on the street, when the witnesses saw him outdoors; assisting him to dress, eat and go about; reading to him and writing checks for him; taking him to conventions and conferences in various cities; taking him to the houses of his (claimant's) children; writing for him; being with him every day; accompanying him to the safe deposit vault and assisting him with pamphlets and letters. Certain pages of the record are referred to as establishing these services, and it will be of advantage briefly to consider the evidence there adduced.

The testimony of claimant's son on this aspect of the case is entirely inconclusive. While the evidence given by him is cited to sustain a recovery prior to 1920, little of it conclusively refers to services during this period, and at least one reference, respecting observing Mr. Horsfield reading to the decedent, clearly appears to have occurred after the Horsfields went to live with Dr. Mason in 1920.

Mrs. De La Verne's testimony on this phase of the case is of no probative value, as she frankly stated that prior to 1920 she only went to Dr. Mason's house on two or three occasions. The testimony of claimant's other daughter, Mrs. Guernsey, is little if any more conclusive. She said that she visited at Dr. Mason's house "several times" before her marriage, in 1917, and that her father brought him to visit her twice at her married home. At the time of her calls she said her father "would be doing the doctor's writing," but how she knew, if she did, that it was the doctor's and not his own, does not appear.

Both Mr. Pilsworth and Mrs. Clark were extremely vague as to time, the former stating that Mr. Horsfield had always accompanied Dr. Mason to the trust company for eight or ten years prior to his death, at which time he apparently placed the Hartford operation which occurred about fifteen years prior to his death, while the

latter was almost equally vague identifying the especial aid as ten to twelve years prior to the doctor's death, at which time she appeared to think the operation had occurred.

Mr. Rauch's testimony was to the effect that from 1918 to 1923 he had charge of a custodian account for Dr. Mason at the Brooklyn Trust Company, after which time a trust account was created, following which witness drew all the checks for him. Questioned by claimant's counsel as to who drew the checks prior to this time, he stated that Mr. Horsfield had done so, but it was not made to appear that he had any knowledge or means of knowledge of the subject.

On its face, Dr. McGill's testimony appears to support the claim for services during this period, but it must be borne in mind that he had known Dr. Mason for seventeen years and that he stated on the subject of time: " The locating of time is a difficult thing for me here. * * * I could not say definitely, you see."

The same applies to the testimony of Mr. Scott, the vault attendant at the Bank of America.

In the face of this general vagueness, we have the evidence of Mrs. Blake, who conducted the doctor's household affairs during this period, of her sister and of Agnes McGonigle, the maid employed there. The first named, while undoubtedly interested in the event by reason of her having been named as a legatee under the will, and, further, in consequence of the fact that her children were residuary legatees, appeared truthful on this phase of the case, at least, and the manner and content of her testimony on this particular issue was such as to create a favorable impression on the court. She stated that during the period in question she kept house for the doctor, with the aid of a maid, a furnace man by the name of Kelly, and an attendant of Mr. Mason's, named " Bill " Pellew; that the latter came each morning and read the mail to the doctor, except certain letters concerning the Brooklyn Trust Company and the Title Guarantee Company; that he read to him and took him to such places as he wished to go, leaving after supper in the evening; that during this entire period Dr. Mason was entirely able to dress himself and get around the house unaided, and that he went to church without assistance, this involving no crossing of streets; also that Dr. Mason during the period in question had a summer home at Greenwich, Conn., at which he spent a considerable part of his time. Her testimony regarding Mr. Horsfield was that he was never at the house in the evening and that she would not see him at any regular time during the day; that Dr. Mason accompanied him to the mission on Friday nights.

This testimony was largely corroborated by Mrs. Twachtman,

a sister of Mrs. Blake, who testified that between 1912 and 1920 she visited Dr. Mason's house at least once a week.

Agnes McGonigle, the maid who was employed at the house from 1915 to 1920, further corroborated Mrs. Blake. She also stated that during the summer Mr. Horsfield came to the house every day for lunch and stayed with the doctor for a while and that they talked about missionary work; that during the winter Mr. Horsfield called frequently at the house, but never in the morning, and that he had no regular time for so doing. She further testified that during the four summer months, Dr. Mason usually spent his week ends at his summer place at Greenwich, and that for a considerable period he went to the train unassisted, but toward the end of her stay in the house, Pellew, or, if he was not available, Mr. Horsfield, would take him over.

Even in the absence of this convincing testimony of petitioners' witnesses, the court would experience great difficulty in spelling out of the record any services which would entitle the claimant to any recovery prior to August 1, 1920. It seems clear that during this time the association between the two men was merely that of individuals, both vitally interested in a common labor for what they believed to be the uplifting of humanity. They were close friends of long standing whose interests naturally tended to solidify their association, and the reading and writing which Mr. Horsfield may have done at the doctor's house, and in his company, in so far as it did not purely concern his connection with the brass company employing him, cannot be reasonably interpreted other than as a joint pursuit of a common interest. Their joint attendance at the mission meetings and conventions appears to the court to have been of the same nature during this period, and it is far from clear, in this connection, that Mr. Horsfield was not the one benefited far more than was the doctor. Such slight services as may be gathered from the voluminous testimony to have been performed during this time are no more than the ordinary courtesies uniformly performed without expectation of recompense by the younger of two close friends for his beloved and respected associate and coworker.

There remains for consideration on this phase of the subject, merely the testimony of claimant's witnesses who gave evidence respecting frequent declarations by Dr. Mason to the general effect that he would take care of Mr. Horsfield on his death. His statement in this regard to Dr. Clifford, though apparently made subsequent to 1920, is typical: " He will be provided for. I will make good provision for him in his age."

There seems no valid reason to doubt that the decedent made

many such statements during all of these periods, but, so far as they concern the period now under consideration, they are equally compatible with an intention of conferring a beneficence as with resolving a legal obligation. In so far as such declarations were made prior to 1920, what is more natural, in view of the relations of the individuals, than that Dr. Mason should desire, from his means, to make some provision for his dear friend, who was devoting all of the time which he could spare from earning a livelihood for his family, to a work eminently unselfish and beneficent in purpose, and with which he was so wholly in sympathy?

That Dr. Mason did, in the wills and trusts of this period, make provisions which, under the then existing circumstances, would have been most liberal, cannot seriously be questioned. By paragraph 16 of his will, executed May 16, 1911, he gave the claimant and his wife a legacy of any mortgage indebtedness which he might hold on their house at the time of his death, and in a trust dated April 17, 1911, he gave claimant a life estate in a trust fund of $20,000. This latter provision was continued in his trust agreement dated March 20, 1915, which instrument contained a further outright gift of $1,500 to the claimant and his wife.

Since, under the view taken by the court of the transactions during the period thus far reviewed, Dr. Mason was under no legal obligation whatsoever to Mr. and Mrs. Horsfield, it is obvious that these beneficences were most kind and generous and fully justified all of the statements which he made regarding them.

It is, therefore, found that during the period prior to August 1, 1920, Mr. Horsfield performed no services for the decedent in connection with which the law will imply any obligation of paymen⁺ and this portion of his claim is, therefore, disallowed.

We come now to a consideration of the relations of these individuals during the period beginning August 1, 1920, and terminating with Dr. Mason's death in June, 1927. It has been noted from the testimony of petitioners' witnesses hereinbefore considered, that beginning at some not clearly defined time prior to 1920, Dr. Mason was no longer able to go to the train alone on his trips to his country place, and it seems to have been quite satisfactorily established that at some time between August 1, 1920, and January 1, 1922, Dr. Mason became totally blind. Furthermore, " Billy " Pellew, who, according to the testimony of Mrs. Blake and Agnes McGonigle, had been his attendant during the previous period, had died. If, as seems to be conceded by petitioners, it was necessary for Dr. Mason to have with him an attendant, in the person of Pellew, prior to 1920, it is obvious that this would become increasingly essential as the doctor's infirmities progressed. In any case,

it is established that about August 1, 1920, Mr. and Mrs. Horsfield broke up their own home, sold their house, and came to live at the residence of Dr. Mason. The testimony respecting Mr. Horsfield's activities during this later period is in striking contrast with that just considered respecting the earlier time, and it is possible to obtain a clear picture of the daily lives of the members of the household from a long array of wholly disinterested witnesses whose opportunities for observation are not open to question, and whose testimony was not impugned in any material aspect.

This testimony determines to the complete satisfaction of the court that during this period Mr. Horsfield performed all of the usual services of an attendant and secretary to Dr. Mason. He dressed and undressed him and saw to it that his clothes were in order. At meal times he would guide the doctor to his chair and seat him, put on the apron or bib which he customarily wore, cut his meat and prepare and arrange his food, and see to it that his plate was supplied. After the meals Mr. Horsfield would read to and write for him, and take him out to such places as he wished to visit, guiding him. Upon their return he would assist him in writing and in the preparation of lectures and pamphlets and would generally oversee and assist in all his affairs and activities, aiding and protecting him at all times. Dr. Mason had a little cricket or clicker which he always had with him, and with which he would summon Mr. Horsfield at any time of day or night that he wished his attendance. Later a buzzer was installed between their sleeping rooms, and the doctor used this in summoning him during the night. No good purpose will be served in reviewing in detail the testimony of all of the witnesses whose evidence substantiates these facts. In particular, the testimony of the maids, who were of an exceptionally high grade of intelligence, made a most favorable impression. They were evidently telling the truth, and the manner in which their testimony was delivered could not but carry a conviction of its accuracy and trustworthiness. The same applies to the evidence given by such witnesses as the Rev. Drs. McGill and Clifford, to Mr. Pilsworth, the trust officer of the Title Guarantee and Trust Company, Mr. Cole, the vice-president of the Brooklyn Trust Company, and several of the other testimonial witnesses.

The conclusion reached by the court respecting the services rendered corresponds with that expressed by the Rev. Dr. Clifford: " Mr. Horsfield was as faithful to him as a little dog," or, as was said by the Rev. Dr. McGill: " He paid attention to him like an invalid brother," to which may be added the expression of Mrs. Guernsey: " He attended to him just like a child."

Not only were the services performed by Mr. Horsfield during

this period different in degree from those which he rendered prior to taking up his residence with Dr. Mason, but it is quite apparent from much of the testimony that they differed materially in kind. During the former period the two men seem to have been acting as friends and associates; during the latter, the relationship was clearly that of superior and subordinate. It was shown by at least one of the witnesses that Dr. Mason referred to Mr. Horsfield as "his attendant," and since the latter took the place and performed all the duties, and more, which had previously been performed by the deceased Pellew, who admittedly acted in that capacity, it seems unquestionable that such was the relationship which, in part at least, he bore to him. It was shown that he announced callers to the doctor, ushered them in, and then retired, or was ordered from the room; that when his presence was again desired, the doctor would sound his clicker and Mr. Horsfield would obey the summons.

The fact that during this period Mr. Horsfield continued his missionary activities by no means negatives the propriety of allowing him a recovery for the services which he rendered, once the relationship of employer and employee is established, either by express agreement or by the conduct and relationship of the parties. Indeed, this connection and the interests which gave rise to it would seem unquestionably to have lent to the services of the claimant to Dr. Mason an entirely unique value which probably could not have been duplicated by any other attendant whom the doctor could have secured.

Since, therefore, it is undisputable that Mr. Horsfield performed services for Dr. Mason and the latter not only accepted but sought those services, the principle of law enunciated in *Moore* v. *Moore* (*supra*) and similar cases, above discussed, becomes applicable, and the law implies a promise to pay what the services were reasonably worth.

The testimony of petitioners' witnesses was entirely inadequate for the purpose of rebutting this presumption. A nephew of deceased testified to a conversation alleged to have been had with Mr. Horsfield shortly after Dr. Mason's death, at which time the claimant is alleged to have said, " * * * I did not have any agreement or understanding with him at all. I felt that your uncle was a good Christian man and that he would treat me properly when he died and I had [have] been very much disappointed." Examined in rebuttal, Mr. Horsfield denied any such statement and even if it was made it would have no effect whatsoever on his right to recover on a *quantum meruit*.

The question of the value of the services rendered was, as is

usual in such cases, made the subject of expert testimony which in this instance was peculiarly convincing in character. Mr. Maurie C. Bryan, in particular, displayed a broad knowledge of the subjects involved which lent exceptional weight and value to his contribution in the solution of the problem. As a result of the testimony adduced, it is the opinion of the court that the reasonable value of Mr. Horsfield's services as shown by the record for the period between August 1, 1920, and January 1, 1922, was $75 per week, and from January 1, 1922, to June 11, 1927, was $100 per week.

The claim of Mrs. Horsfield is for services as housekeeper and nurse from August 1, 1920, the time when her home was broken up and she went to live with Dr. Mason, to June 11, 1927, the date of his death, at the rate of thirty-five dollars per week.

That during this entire period she performed the services of housekeeper is, on the record, impossible of successful contradiction. It is proved beyond a doubt by the testimony of the tradespeople with whom she dealt, by all the living servants at the house during the period, by a neighbor, by a trained nurse employed during the doctor's last illness, and by the multitude of witnesses who called at the house and testified respecting their observations. The value of such services as she unquestionably performed was proved by competent and satisfactory testimony.

In an effort to undermine this testimony, evidence was adduced from Mrs. Blake, the wife of one of decedent's nephews, who, as stated, was a legatee under the will and mother of residuary legatees, of a declaration by Mrs. Horsfield: "We don't look for anything from Dr. Mason but we would appreciate a little gift." This was categorically denied by Mrs. Horsfield, and from the manner and demeanor of the witnesses the court is inclined to give greater credit to the denial than to the affirmation. Even if such a remark were made, which seems improbable, it seems doubtful whether it should be given the effect contended for it of nullifying almost seven years of trying service, conscientiously performed.

On the record shown, the court finds that Mrs. Horsfield is entitled to payment at the rate of $125 per month for the period for which she claims.

It is the contention of counsel for the claimants that they should be entitled to recover the value of their services as found, in addition to the legacies left to, and the trust provision made for, them. With this position, the court cannot agree. It is perfectly true that such provisions were contained in instruments executed by the decedent at a time anterior to that in which the services were rendered, but that is immaterial in the determination here. It certainly would be a novel doctrine to maintain that by reason of

the fact that a person is named as a legatee in a will, or a beneficiary under a revocable trust, he thereby obtains a vested interest in the subject-matter of the tentative benefaction. It is possible that there might be some room for argument on the question in a case where, at the time of the decease, the will or trust instrument was found to have been drawn prior in point of time to the rendition of the service and remained in the same form, without any modification whatsoever, until the end, but such a case is not here presented. Dr. Mason's will, to be sure, was originally executed on May 16, 1911, but seven codicils were executed by him subsequent to the commencement of the services, recovery for which is here allowed, namely, on March 6, 1922, April 24, 1922, March 6, 1923, March 28, 1924, February 17, 1925, April 28, 1925, and May 18, 1926. Likewise, whereas the original trust agreement with the Title Guarantee and Trust Company was made on June 17, 1902, and the clause establishing the trust for Mr. Horsfield was inserted by amendment dated April 17, 1911, Dr. Mason made further alterations and amendments materially changing the terms of the trust on April 24, 1922, subsequent to the beginning of this term of service.

Since, irrespective of whether or not there was an express contract that Mr. and Mrs. Horsfield would be remunerated for their services at a time subsequent to the doctor's death, there must be held to have been at least a tacit understanding to that effect as a result of decedent's many unquestionable declarations on the subject, the conclusion is irresistible on theory that he felt that the provisions theretofore made were adequate for the purpose. While the court cannot agree with his conclusion, it is nevertheless equally unable to adopt any position other than that what he, in effect, tendered in full payment, must be treated as a part payment.

Fortunately we are not compelled to base a decision to this effect solely upon reason, since the precise question has been passed upon by the Court of Appeals of this State. In *Reynolds* v. *Robinson* (64 N. Y. 589) the court says (at p. 593): " The evidence tends strongly, if not conclusively, to show that the understanding of all the parties was that the testator was to pay for the services rendered by Mrs. Reynolds by a provision for her in his will. If the referee, upon a new trial, finds that there was such an understanding, then the main question to be determined will be, whether the provision made in the will for Mrs. Reynolds was sufficient to pay for her services. * * * If he should find that it was not, then the plaintiff may recover the balance after deducting the legacy of $1,500 to his wife."

In conclusion, certain matters relative to the admission of evidence

and questions of law raised in the course of the trial should receive a passing notice.

The first relates to the applicability of the Statute of Limitations as barring a recovery of a portion of the claims. It must be clear that the statute does not apply. There is ample proof that even in the absence of any express agreement, there was a tacit understanding between the decedent and claimants that their services should be recompensed after his death. Even excluding from consideration the testimony of the claimants and all members of their family, it affirmatively appears, without contradiction, that decedent made such a declaration to the witness John Kay, in the presence of Mr. Horsfield, about the year 1922. The claimants were entitled to rely upon this representation. Consequently, there could be no breach by Dr. Mason until his death, and the statute did not begin to run until that time. (*Leahy* v. *Campbell,* 70 App. Div. 127, 130, and cases cited.)

Counsel for respondents complains of the admission in evidence, on redirect examination, over his objection, of a conversation between Dr. Mason and Mrs. Blake on the subject of her departure from the doctor's house. This testimony was clearly admissible for the reason that counsel for respondents on cross-examination had himself examined the witness on the subject and had thus introduced parts of it into the record, and it is fundamental that where such a course is adopted it is competent for the opposing party to bring out the balance of the conversation. (*People ex rel. Eggers* v. *Bingham,* 121 App. Div. 593; affd., 190 N. Y. 566; *Singer* v. *National Fire Ins. Co.,* 154 App. Div. 783; *Mumford* v. *Whitney,* 15 Wend. 380.)

On the other hand, a statement of the doctor to Mrs. Blake, made in the absence of the claimants, that they were to come to the house under the same arrangement under which the witness had resided there, is of no probative value whatsoever. If actually made by him, it was a self-serving declaration which could readily be accounted for in a dozen ways not involving an admission of its correctness as a complete mirror of the arrangement.

Objection was made to the admission of the testimony of Mrs. Emily Roberts-Horsfield, respecting the claim of her husband, on the ground that her portion of the services was part of an entire contract, for which her husband was entitled to recover. The evidence was admitted on the strictly limited issue as to what her husband did, to support his claim for services. The claims of Mr. Horsfield and Mrs. Horsfield were separate and distinct, and the services on which they were based in no way overlapped. Mr. Horsfield made no claim for his wife's acts and did not object to her

prosecution of her individual claim. Under these circumstances, it appears to the court that section 60 of the Domestic Relations Law is extremely pertinent. So far as important in this connection, it reads: "A married woman shall have a cause of action in her own sole and separate right of all wages, salary, profits, compensation or other remuneration for which she may render work, labor or services * * * and her husband shall have no right of action therefor unless she or he with her knowledge and consent has otherwise expressly agreed with the person obligated to pay such wages, salary, profits, compensation or other remuneration. In any action or proceeding in which a married woman or her husband shall seek to recover wages, salary, profits, compensation or other remuneration for which such married woman has rendered work, labor or services * * * the presumption of law in all such cases shall be that such married woman is alone entitled thereto, unless the contrary expressly appears * * *."

It must be apparent from this wording that the intent of the Legislature was, in the absence of express assent by the wife, to sweep away the last vestige of the doctrine that "husband and wife are one person and the husband is that person." The only reasonable construction which can be given to it is to the effect that so far as concerns her employment by third parties, a wife is as equally an independent contractor as she would be were she unmarried. (See *Stevens* v. *Cunningham*, 181 N. Y. 454, at p. 458.) If this conclusion is correct, it must follow that the evidence of either husband or wife is properly admissible on an issue, as here presented, of acts done by the other on an independent employment by a third person. (*Matter of Brush*, 226 App. Div. 683.)

The final objection relates to the admission of testimony respecting the amount of property at the time of testator's death in the trust created by him. This was, under the theory of the case adopted by the court, a necessary link in the chain of determination of the controversy. On the one hand, it was contended that the estate was liable to the claimants for services rendered in sums aggregating over $49,000. These claims were defended on the theory that no obligation ever arose, or if any did arise that it had been fully satisfied by testamentary and trust benefits conferred. The value of any such benefit would be directly affected by the question of the resources in the estate or trust applicable to the payment of the legacies or gifts given. If the fund was inadequate, the gift would possibly abate. Consequently, their adequacy was a pertinent subject of inquiry. In so far as the testimony on this subject tended to show more than this, it has been wholly disregarded by the court in its determination.

In reaching the results here attained, the court has taken into consideration the testimony of all witnesses on the subject of Mr. Horsfield's claim prior to August 1, 1920, but has eliminated from consideration the testimony of Mr. and Mrs. Horsfield, their son and two daughters on the determination of Mr. Horsfield's later claim and the claim of Mrs. Horsfield, the latter two questions being thus determined on the testimony of witnesses wholly disinterested in their recovery.

As hereinbefore stated, the court considers the reasonable value of Mr. Horsfield's services from August 1, 1920, to January 1, 1922, to have been $75 a week, and from January 1, 1922, to June 11, 1927, to have been $100 a week. His claim is for lesser sums in each instance and he must, of course, be limited to the amount he claims, which aggregates a total of $24,400.

The court considers the reasonable value of Mrs. Horsfield's services to have been $125 per month. Her term of service was eighty-two months and eleven days. The total reasonable value of her services was, therefore, $10,295.83.

The pecuniary provisions for the claimants under Dr. Mason's will and trust deed were, under the will, $500 to Mr. Horsfield, and under the trust deed, $1,500 to them jointly, and to Mr. Horsfield a life estate in a trust fund of $20,000. It was testified that at the time of Dr. Mason's death, Mr. Horsfield was sixty-six years of age, which, on the basis of mortality tables, would give a then value of such trust life estate of $7,049. It, therefore, follows that Mr. Horsfield is entitled to receive from the estate the sum of $24,400, less $500, less $750, less $7,049, or a net sum of $16,101, over and above his interest under the will and trust agreement, and that Mrs. Horsfield is entitled to receive the sum of $10,295.83, less $750, or a net sum of $9,545.83, in addition to the provision for her in the trust deed.

The provision in the 12th paragraph of Dr. Mason's fifth codicil is not to be included in the testamentary benefits to be considered in this connection. It looked to a payment for additional services to be performed after his death at a rate which has not been shown to be an excessive return for such services. In addition, it is merely precatory in any event.

Since, if these sums had been added by decedent to the bequests in his will, they would not have been payable until one year subsequent to his death (Surr. Ct. Act, § 218), and since such an act on his part would have completely satisfied the understanding of the parties, interest on these sums will be allowed from June 11, 1928.

Enter decision and decree, on notice, accordingly.