In the Matter of the Estate of THOMAS J. BRUSH, Deceased.

Surrogate's Court, Kings County, January 15, 1930.

*William R. Murphy*, for the petitioner.

*Robert H. Koehler*, for the claimant.

WINGATE, S.   The question here propounded concerns the propriety of the rejection by the administratrix of a claim for $8,000 presented by one Mary F. Robinson.   The proof of claim reads in part as follows: " That the consideration of said debt is a contract entered into by the decedent and the deponent eighteen years ago for the care and maintenance of himself and his wife, Mary A. Brush, for three or four months during each summer during the term of their natural lives under specific agreement that he will leave a suitable sum to the claimant under his last will for the care and

maintenance of himself and his wife for that time. That the said claim is also based upon a claim for work, labor and services rendered, use of auto, horse hire and meals furnished to decedent and his wife by deponent, and services generally rendered to Mary A. Brush, the wife of decedent, for a period of three or four months during the summers for eighteen years prior to the death of decedent, for all of which deponent claims the sum of eight thousand dollars ($8,000) and interest at the rate of six per cent per annum, which is the reasonable value thereof."

The intestate died in August, 1926. This claim was verified September 12, 1927, and was rejected September 19, 1927. According to the testimony adduced upon the first hearing, the claimant is a typical small farmer's wife, living on her husband's farm in Dutchess county. He worked the farm and she performed the usual household duties. The court ruled on that occasion that under such conditions the claim of the wife for care and entertainment of boarders was in effect derived from her husband, it being the understanding of the court that the essence of any such arrangement was the furnishing of lodging in the home belonging to her husband and the supplying of meals from produce yielded from the working of his farm.

The court felt that the wife, under such an arrangement, was acting merely as a retailer of the farm produce of the husband, and her claim being thus derived from him his testimony in its support was within the inhibition of section 347 of the Civil Practice Act. This view was, it was thought, strengthened on the facts shown in the instant case, that a part of the remuneration sought was for the use of the automobile and horse and wagon, concededly owned and driven by the husband of the claimant. On appeal the Appellate Division adopted a contrary view and remitted the case for retrial (*Matter of Brush*, 226 App. Div. 683), which has now been accomplished.

This court had recent occasion in *Matter of Mason* (134 Misc. 902) to consider at length the principles applicable to problems similar to the present. The authorities governing cases of this type were then largely collected and reviewed. In the instant case there is no semblance of an agreement for remuneration in any specific sum. In consequence, recovery, if any, must be based upon a *quantum meruit* upon the reasonable value of the services rendered. (*Matter of Mason, supra*, 906, and cases cited.)

Obviously, in determining any question of *quantum meruit* for services performed, two elements are essential, namely, a showing of the service rendered and a rate for such service based upon the number of days or hours of its duration. (*Shirk* v. *Brookfield*, 77

App. Div. 295, 298; *Winch* v. *Warner*, 186 id. 710, 713; *Featherstone* v. *Fowler*, 174 id. 452.) Adverting to the first element, we note that the services for which claim is made are for decedent and his wife " for a period of three or four months during the summers for eighteen years " prior to his death. He died in August, 1926. Therefore the proof, to conform to the sworn allegation of claim, should cover three or four months during the summers from 1908 to 1926, inclusive.

As the case was tried, the testimony on behalf of the claimant is naturally divisible into two classes, that adduced prior to the testimony of the witnesses called for the administratrix and that elicited after such witnesses had testified. Taking the witnesses of the first class we find the following:

Charles Robinson, claimant's husband, testified that for twenty years Mrs. Brush was a boarder at his house every summer from Decoration Day to Labor Day, and that decedent passed from two weeks to a month and week-ends there for twenty-five years. Anna Utter, claimant's niece, swore on her direct examination that Mrs. Brush was there continuously from Decoration Day to Labor Day, inferentially for seventeen years, while on cross-examination she modified this by a statement that such visits were discontinued about seven or eight years before her death, which would make her last stay about 1917. This apparently displeased claimant's counsel, who, on redirect, extracted a statement from the witness that Mrs. Brush spent that period there every year up to the time of her death. On recross she elected a compromise between the two statements, by splitting the difference and fixing the last stay as 1920. She identified the presence of decedent as being on every week-end and on vacations of from one to two weeks' duration.

Bert L. Smith, claimant's brother-in-law, apparently sensing the difficulty of the previous witness in permitting years to come into question, failed to dwell on such mere detail, contenting himself with insisting on Decoration Day to Labor Day for the wife and week-ends and periods of one to two weeks for the husband, with the number of such periods not stated. Edwin B. Wixon, another brother-in-law, was less cautious, not only asseverating that the decedent was there every year for weeks at a time, but asserting that his wife came every June, including the years 1923 and 1924, if he was " not very much mistaken," for periods of three to four months. This enthusiasm, while perhaps commendable from the standpoint of his sister-in-law, did not add to the credibility of his testimony, as the wife had died in February, 1924.

Mrs. George Wixon, a sister-in-law, followed; her testimony being " Decoration Day to late in the fall " for the wife and two weeks

for the husband. According to this witness, such stays occurred in "a good many years," whatever that may be supposed to prove.

The last witness in this category was claimant's sister, Edna Smith, who apparently felt that her closer relationship to the claimant should induce bigger and better testimony. She placed the stay of the wife as sometimes starting at Easter and continuing to Labor Day. She further swore that the wife was there from Decoration Day to Labor Day in 1923.

Before noting the testimony of the claimant herself, it will be well to compare this much shaken and contradictory testimony of the husband, sister, niece, two brothers-in-law and sister-in-law of the claimant with the testimony adduced on behalf of the administratrix. This testimony came from four strangers, from the wife of decedent's nephew, and from the administratrix with the will annexed; the testimony of the latter two being merely corroborative of the strangers.

Alexander Suydam, a stranger, testified that he had known decedent since 1890; that the latter was, up to 1919, the vice-president and in charge of the office of the Peter Barrett Manufacturing Company, where the witness was employed; that he seldom took a vacation, and never more than a week in any year.

Anna McIntosh, a stranger, testified that she had known decedent and his wife for twenty-one years; that she had kept a series of rooming houses at Rockaway Beach, at which the decedent and his wife had roomed, and that she knew of her own knowledge that decedent's wife had spent every summer between 1908 and 1920, from Decoration Day until after Labor Day, at Rockaway Beach, the decedent commuting and spending week-ends there; that in the summers of 1920 and 1921 they had not roomed there, but had made week-end visits. This testimony was corroborated in part by Helen A. Reilly, another stranger, who summered for a part of the time at Rockaway Beach.

Rose Buxton, a stranger, testified to twenty years' intimate acquaintance with decedent and his wife and to visits with her several times a week for about seven years before her death; that Mrs. Brush spent the summers of 1922 and 1923 in Brooklyn, and that the witness visited her there almost every day, from Decoration Day to Labor Day, during these years.

The testimony of Anna E. Clark, the wife of decedent's nephew, and of Ella McLaren, the administratrix, tended to corroborate the three last-named witnesses.

We now come to the testimony of claimant herself. This was probably objectionable, at least in part, and objection was interposed thereto at the hearing, the testimony being taken subject to a motion

to strike out. The objection was, however, subsequently withdrawn in the memorandum of the attorney for the administratrix. In the course of her voluminous examination and cross-examination, the claimant proved to be a most evasive and unsatisfactory witness, entitled to absolutely no credibility whatsoever. In the early part of her examination she seemed to strive to reconcile her testimony with that which had been elicited from the witnesses for the estate, but she later reverted at times to the facts sworn to in her proof of claim, with the result that so far, at least, as she was concerned, the record became a patchwork of contradiction and palpable perjury. Thus she testified that, beginning in the fall of 1902, decedent and his wife came " almost every year during the winter months, the spring, fall and winter months," before and after the time they spent the summer at Rockaway Beach, but " long after " that, about 1916 or 1917, although she was " not positive " of the time, down to her death, but not including 1920, or 1923. Mrs. Brush spent " I should imagine between two to three — about three months each year, I should think " (Stenographer's Minutes, p. 106), " about every year " (Id. p. 106), " I am pretty sure " (Id. p. 124). " Mrs. Brush generally spent three or four weeks, sometimes four, and sometimes less, and sometimes more." " They generally came up every year." Mrs. Brush would spend " several weeks, I would say. I could not very well remember."

On this testimony, two legal questions are presented. The first is whether the proof on behalf of the claimant, standing alone, would entitle her to recover on her claim for services " for a period of three or four months during the summers for eighteen years prior to the death of decedent." The natural meaning of " summers " is the three months of June, July and August, which fact was unquestionably recognized by the claimant at the start, as the testimony of all her witnesses, other than herself, as hereinbefore reviewed, was directed to such period. Her testimony, adduced after the witnesses for the estate had demonstrated beyond a reasonable doubt that decedent and his wife had spent their summers at Rockaway Beach for some twenty-one years, shifted this position and absolutely contradicted her own sworn claim, and the previous witnesses who had testified on her behalf, as to all years prior to about 1916 or 1917, further eliminating the years 1920 and 1923. Thus, on her own admission, the summers during which any claim was asserted by her were reduced from the eighteen, which she had sworn to, to a maximum of six.

As against this, claimant's niece, Anna Utter, who lived in claimant's house up to the time of her marriage in 1925 (which was subsequent to Mrs. Brush's death), testified, first, that Mrs. Brush

made her last stay there in 1917, finally changing this to 1920. Her testimony is at least as credible as that of the claimant herself, and having been introduced by the claimant, is binding upon her. This testimony, if believed, would reduce the claim to a maximum of four years or a minimum of one.

Taken at its best, however, and granting that such a term may be employed in connection with the testimony on behalf of the claimant, the court is utterly unable to identify any particular time or period as having been shown with reasonable clarity during any single summer month as one in which the alleged care or board was furnished to decedent or his wife. Under such circumstances, the basic element by which a *quantum meruit* may be measured is missing. Even were it to be held that such basic prerequisite could in some way, *prima facie*, be spelled out, this could not result in a recovery for the claimant, in view of the testimony adduced on behalf of the accountant, which was flatly contradictory, credible and essentially unimpeached. No trier of fact would hesitate for a moment in determining, from the appearance and demeanor of the witnesses for the estate, as well as from the content and manner of delivery of their testimony, that they were entitled to greater credence than those for the claimant.

An additional element for consideration in this connection is that substantially all of claimant's witnesses were her relations or connections by marriage, while those in opposition were largely strangers, who possessed no conceivable interest in the event other than to promote justice and to prevent the looting of the estate of a deceased friend. In view of the fact that the claimant has utterly failed to substantiate her right to recover under her sworn claim for services performed, the alleged declarations of the decedent of intent to benefit the claimant became immaterial, since " it must * * * follow, in cases like that here presented, where the making of a special contract to pay the reasonable value of the services is alleged, that the fact of whether or not such contract was actually made is substantially immaterial. If made, it would amount merely to a formal recognition by the parties of what the law presumes. If not made, the legal effect of the acts done would nevertheless be recognized, and in either event only such recovery could be had as was commensurate with the value given and received." (*Matter of Mason, supra,* 906, and cases cited.)

No good purpose would be served in reviewing at length the testimony of the claimant's witnesses respecting alleged declarations of decedent along this line. As was said by the Court of Appeals in *Hamlin* v. *Stevens* (177 N. Y. 39, at p. 47), in commenting upon an alleged agreement of like nature: " Contracts of the character in

question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents. * * * Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses." To like effect see *Gnichtel* v. *Stone* (233 N. Y. 465, 469); *Taylor* v. *Higgs* (202 id. 65, 69); *Tousey* v. *Hastings* (194 id. 79, 81); *Matter of Buckler* (227 App. Div. 146).

In the instant case the only witnesses, aside from those whose testimony has heretofore been considered, who testified along this line, were an aunt of claimant's husband and a stranger, Edward B. McGarry, whose testimony as a whole was so evasive and preposterous as to be wholly unworthy of credence. An additional consideration in this connection, which is worthy of passing note, is that according to the testimony of claimant's husband he had two conversations with decedent, in which such alleged declarations were made, the first in 1909 and the second " about " 1924 or 1925. He stated that the latter was in the presence of a stranger, Gil Dakin, who was alive at the time of the trial and living in Paterson, N. J., but was not produced as a witness. While the court feels that no recovery by the claimant is possible on her sworn claim, as filed, for the reasons heretofore given, it is of the opinion that the record as a whole, particularly the testimony of the administratrix, indicates that decedent and his wife occasionally made short visits to the house of the claimant and her husband at times other than those set forth in the proof of claim.

While, strictly speaking, the claimant must be held to her sworn allegations of claim, the court conceives it to be the province of an equitable tribunal to adjudicate the strict rights of the parties before it, without undue subservience to technical rules of pleading. If, therefore, the claimant is entitled to any recompense from the estate on any basis whatsoever she should receive it. In view of the evident exaggeration and deliberate perjury of the claimant's witnesses, the court, as is its right as the trier of the facts, is not inclined to give their statements any credence whatsoever. (*McKeon* v. *Van Slyck*, 223 N. Y. 392, 398; *Caldwell* v. *Lucas*, 233 id. 248, 254; *Collier* v. *Rutledge*, 136 id. 621; *Matter of Wood*, 207 App. Div. 41, 43; *Matter of Mason, supra,* 904.)

Accepting, therefore, only the statements of petitioner's witnesses, it appears from the testimony of Mrs. McIntosh that she heard of decedent or his wife spending a week or two at Carmel after Labor Day. Ella V. McLaren, the administratrix, also testified to occasional visits of a week or two in the fall for Mrs. Brush and like week-ends for the decedent, as did Anna E. Clark. Finally, the administratrix testified that after his wife's death decedent spent one week with the claimant each summer and two weeks on one occasion, when he met with an automobile accident, and the estate Exhibits 1 and 2 indicate that he was there on December 10, 1924, and December 3, 1925. When these periods are totaled, they indicate with reasonable certainty that Mrs. Brush spent two weeks in Carmel in the fall of 1919 and that decedent spent two week-ends there in the fall of 1919, one each in 1920, 1921, 1922 and 1923, spent a week there in 1924 and 1925, and two weeks in 1926, and, further, that he spent one day there in December, 1924, and another in December, 1925.

In so far as any claim might have arisen for the 1919 period, it is barred by the Statute of Limitations in view of decedent's death in 1926. There is, therefore, presented for determination the question of the propriety of an allowance to the claimant for board for the decedent for four weeks, four week-ends, and two additional days. As the week-ends may be presumed to be from Saturday noon to Monday morning, we have a maximum of five weeks and three days as the possible claim against decedent's estate. It is unquestionable that, where no blood relationship exists, the rendering and acceptance of service gives rise to a presumption of an obligation to make payment therefor. (*Matter of Mason, supra,* 904, 905, and cases cited.)

Whether the relation of the parties to the instant transaction was such as to rebut this presumption now remains for consideration. It appears that their acquaintance dated back to Easter, 1902. At that time decedent's son, who was suffering from tuberculosis, had been a regular boarder with claimant and her husband for a year or two, his board being regularly and punctually paid. By arrangement with claimant, his parents came to visit him on Easter day, and thereafter a friendship gradually ripened, which appears to have been marked by reciprocal visits and frequent correspondence. Edna Smith, the sister of the claimant, testified that she visited decedent and his wife at Rockaway Beach, and at least two of the claimant's exhibits (1 and 6) refer to visits or possible visits by the claimant and his wife to decedent. It appears throughout the record that decedent and his wife were always referred to as Uncle Tom and Aunt Mary, and they appear to have treated the Robin-

sons as familiar, intimate friends, and to have received such treatment in turn.

Unquestionably, although not proved in this case, they spent a certain amount of time at the Carmel house of these supposed friends. That this was done without any payment or reciprocal entertainment of the Robinsons, the entire character and disposition of decedent tends to disprove. He was a man of modest, but adequate, means, regularly employed, and with a not inconsiderable outside income from investments and from tenants of portions of his house on Herkimer street. The bills for their board at Rockaway Beach and of the semi-invalid son, which latter antedated the friendship, were always punctually paid, and it was shown that when the Robinsons were in trouble with a mortgage on their house in 1910, the Brushes came to their aid and took it over. The record shows that the mortgage was subsequently satisfied, but, aside from the unreliable testimony of Mrs. Robinson herself, there is no showing that there was any consideration for this satisfaction. If, as she claims, the mortgagee was heavily indebted to her at that time for board and service, it seems highly improbable that the claimant would have omitted the opportunity thus offered to set off one obligation against the other. Furthermore, it appears that in or about February, 1910, when the mortgage then owing a third party had to be paid, this circumstance was a matter of considerable concern to the Robinsons; yet it was satisfied about a year and a half later. No explanation was given as to how or from whom the money was procured.

Frequent references were made in the testimony to promises made by decedent to buy the Robinsons a new automobile, but on the stand they denied that he had done so. In this connection it may or may not be pertinent to note that respondent's Exhibit 5, which is a letter dated September 9, 1924, from decedent, in referring to his stay with the Robinsons, contains the phrase: " Keep the roads burned up with *our* automobile." It seems unlikely that the use of the possessive pronoun was inadvertent, nor are the tenor or contents of the letter what might be expected from a defaulting boarder who had sponged on the addressee for eighteen years. It may be frankly admitted that this is all conjecture, yet it is the natural inference which must arise in any mind from the facts disclosed by the record and the conduct of the witnesses on the stand. Were it necessary to reach such a conclusion the court would feel entirely justified in holding that the relations between the parties here shown to exist were such as to successfully rebut the usual legal presumption of intention to make and receive payment.

Fortunately, however, there is more tangible evidence in the record covering this question. The claimant testified that, when the Brushes first spoke to her about staying, they said, " We will pay you exactly the same board that we paid upstate," and that she understood this to be fifteen or twenty dollars a week for both of them. As above noted, it appears that the only board shown to have been furnished with sufficient definiteness to warrant a recovery and not barred by the Statute of Limitations is for the equivalent of five weeks and three days for the decedent alone. If, as would seem to be indicated from her failure to object thereto, fifteen to twenty dollars a week was a fair return for this service for claimant and his wife together, it would seem to follow that a payment of ten dollars a week for the decedent alone would be adequate. For the period shown, this would result in a total obligation of fifty-four dollars and twenty-nine cents, but it was shown (petitioner's Exhibits 1 and 2) that on December 10, 1924, he paid the claimant twenty-five dollars and on December 3, 1925, he paid her the further sum of thirty-nine dollars, making a total of sixty-four dollars, which is well in excess of the only obligation which can reasonably be deduced from the record. On any basis whatsoever, therefore, the claimant must be denied any recovery against the estate.

Any review of the case would be incomplete which did not advert to the testimony of the claimant just prior to and at the time of the introduction into evidence by the estate of the checks for these 1924 and 1925 payments. She had admitted that decedent and his wife had at all times punctually paid them for the board of their son, but so far as concerned themselves, testified emphatically: " My dear man, they never paid me anything." Again: " Q. Did you ever get any money from them at all? A. I did not, never." Again: " Q. Do you still want to repeat that Mr. Brush never gave you a dollar? A. He never did. I can lay my hand on the Bible to that effect." She thereupon attempted to evade further questioning along this line by a statement that he never gave her any board money, whereupon the court took the matter in hand, to the following effect: " Q. (By the surrogate): Answer the question. Did he give you some money? A. No, he did not give me no money. Q. Never gave you any money at all for anything? A. No, he never gave me no money."

The attorney for the estate then produced the checks in question, concerning which she attempted a voluble and entirely unconvincing explanation as to their being presents. Her further testimony along this line is also illuminating: " Q. By Mr. Koehler: Are there any other checks? We will explain them afterwards if

we can. Were there any other checks that you received? A. I don't remember any other checks outside of these. Q. Do you remember any other checks at any time that Mr. Brush gave you? A. No, I do not. I really don't *without it comes up later.*"

Further comment is unnecessary. A stream can never rise above its source. The court is of the opinion that the presentation and prosecution of this claim was the result of a family conspiracy, resulting from claimant's violation of the Tenth Commandment of Hebraic law, to loot the estate of their deceased friend. The court finds that the estate is in no way indebted to the claimant, and the claim is wholly denied, with costs to be paid by the claimant personally.

Proceed accordingly.