In the Matter of the Estate of ONOFRIO ABRUZZO, Deceased.

Surrogate's Court, Kings County, May 19, 1930.

*Reuben Leslie Maynard,* for Atala Mena, executrix.

*Baldassare Lamberta,* for Filippo Bilello and Calogero Abruzzo, executors.

*Daly, Hoyt & Mason,* for the mayor, town assessors and counselors of Santa Margherita Belice, Italy, respondent.

*Ralph Atkins,* for Vice Consul of Italy at New York.

WINGATE, S. This application for a voluntary intermediate accounting has been consolidated with a previous petition for a compulsory accounting and removal of executors, and the case has been heard on objections to the account as filed. The questions for determination concern the propriety of the account, the validity of a claim presented by one Adele P. Virnard, and whether the conduct of the executors had been such as to require their removal.

The preliminary demonstration by the objector that the deceased died in December, 1915, that letters testamentary were issued to the accountants in June, 1916, that no motion toward an accounting was made until February, 1930, and then only after a compulsory proceeding had been instituted, and that the original estate totalled only a little over $64,000, is so startling as to cast upon the executors a heavy duty of explanation for their apparent dilatoriness. The essential matter for determination is as to whether they have successfully borne the burden which the recital of these unquestioned facts places upon them.

For many years prior to his death the decedent lived with one of the executors, Atala Mena, and her sister, Adele Virnard. In his will he describes them as " two very honest and refined sisters, widows, who, for the past 28 years, have taken care of my home and rendered most satisfactory and valuable services to me, without receiving any compensation thereof."

These sisters kept a penny candy store in a building described as a " shanty," belonging to the decedent. He permitted them to use it, rent free, in return for their keeping the building in repair. He occupied some of its rooms, for which the sister Adele cared. She boarded him, mended his clothes, trimmed his hair and beard and during the eleven months of his last illness nursed him day and

night.  For a time  he paid board, but then discontinued this, owing to the fact that his money was tied up in unimproved real estate; and for the last ten years of his life he paid nothing.  His will, executed about a year before his death, is ample evidence that this fact did not cause any change in the care and attention given him.

This will devised to the sisters two parcels of realty for life and the testator further bequeathed to them " all my personal property and effects in my home at the time of my death, for their sole use, benefit and enjoyment during their lives     *    *    *." '

It was shown at the hearing that the decedent always gave the sisters to understand that their bequest was to embrace his bank accounts, the books for which were kept in the house.  This has no bearing upon the case except as throwing light upon their actions during a certain period of the administration, but, in the opinion of the court, it is worthy of consideration in weighing the acts of Mrs. Mena up to the early part of 1919.

On his death the decedent was found, indeed, to be land poor, as he had described himself prior to his death.  In addition to the two improved plots, life interests in which were devised to the sisters, he was seized of thirteen vacant plots of land.  The remaining assets of his estate consisted of two mortgages totalling a face value of $15,000, $2,591.07 in two bank accounts, and $525.30 in miscellaneous property, the largest item of which was $275 worth of scrap iron.

Unimpeached testimony was introduced that during the three years succeeding his death there was no market for the sort of unimproved real estate with which the executors found themselves saddled.  By the " fourth " item of the will the executors were vested with discretion as to the time of disposal of this property, and in view of the conditions in the real estate market then prevailing, it can certainly not be said as a matter of law that the manner of their exercise of this discretion, in not throwing the property on the market in a forced sale, was improper.  The uncontradicted testimony shows that they used all reasonable endeavors to dispose of the property at private sale and actually sold one parcel on an advantageous basis in 1917.  In 1918 another sale was negotiated, but its consummation was prevented by the interposition of a new and most serious obstacle to the liquidation of the estate, in the form of the refusal of the title companies to insure the titles to the various properties held by the estate until the validity of the foreign charitable trust had been established by the judgment of a court of competent jurisdiction.

Decedent's will was an Italian notarial document, and there was,

from the first, considerable doubt in the minds of the executors as to its validity and interpretation. As early as August 8, 1916, a proceeding was instituted in this court for its construction, but was dismissed by Surrogate KETCHAM on January 17, 1917, for some undisclosed reason.

On June 22, 1918, the executors filed an intermediate accounting, again praying a construction, but again, on July 2, 1918, their proceeding was dismissed.

In view of these futile attempts to obtain a judicial determination, without which the sale of the realty would have been substantially impossible, the executors determined that their only remedy was by an action in the Supreme Court for a construction. The rejection of the final title company application occurred on October 15, 1919, and, apparently, the action was commenced with reasonable expedition. In view of the difficulty of ascertaining the identity and whereabouts of testator's next of kin, many of whom resided in Italy, the necessity for service by publication, the difficulty in obtaining expert testimony respecting Italian law and the final determination of the necessity for, and the actual issuance of, a commission to take testimony on the subject, the proceeding was unusually protracted, but the record is barren of any indication of lack of due diligence in its prosecution. The decision in the action was rendered on January 25, 1925, and the judgment was entered one month later.

Counsel for one of the executors stated without contradiction: " It was a difficult and extraordinary action — BENEDICT, J., so held. Post War conditions made it impossible to hasten the preparation for the trial of the issues therein. The sudden death of Mr. Grambalvo, attorney for eleven defendants, during the pendency of the action, occasioned a long delay. The service by publication on defendants residing in Italy, resulted in further long delays. But the final result cleared all of the titles to the estate of Abruzzo real estate and made sale thereof possible."

That the executors then resumed their efforts to dispose of the property is evidenced by the fact that on May 13, 1926, a two-lot parcel was sold for $6,000. The wisdom of the executors in not dumping the property on the market in 1916, when unimpeached testimony showed it would not have brought even its appraised value, is indicated by the fact that this one tract, for which they received $6,000, was appraised at $1,500.

No doubt other equally spectacular verification of the correctness of their views would have been forthcoming had not the violation of the attack launched against them in the compulsory accounting proceeding driven them in semi-panic to an auction sale

of the remaining property. Even so, the property so sold realized $42,825 as against an appraised valuation of $29,600, showing a net appreciation over the appraisal of $13,225, or almost fifty per cent. How much more would have been realized had they been permitted to administer the estate unmolested can, of course, only be conjectured, but it is a more or less pertinent circumstance in this inquiry that the four parcels which were actually sold at private sale realized $16,050, as against an appraised value of $6,600, or an increase of something less than three hundred per cent.

Criticism is directed against the litigation of the Inglee specific performance action which resulted indirectly from the initial refusal of the title companies to insure the title. In this connection it is sufficient to note that the original determination in the Supreme Court was in favor of the estate and that, although finally defeated in the action, the compromise price received for the plot was $5,000, instead of the contract price of $3,500. It is scarcely competent to criticise the action of the executors in following competent legal advice respecting their rights in this regard, when a distinct disagreement as to its correctness develops among judges of the Supreme Court, passing upon it in a judicial capacity.

The final serious objection is directed against the two " honest and refined sisters " for pressing their claim to the personal property which they believed to be properly theirs under the will, at a time when taxes and assessments were accumulating on the unimproved real estate. The court is not inclined to view this action with undue severity. These two " honest " old ladies believed with considerable justification that by reason of their unrequited " satisfactory and valuable services " to the decedent, they had a prior claim upon his bounty. Not only was this feeling by no means unnatural, but the record demonstrates that the decedent had given them this assurance. Being " honest " themselves, it is reasonable to assume that they did not believe that either the decedent or legal interpretation of his acts would be less so. They felt, not without reason, that their position should not be prejudiced by a possible waiver of their rights until a judicial determination had been had respecting them. So long as there was a possibility of extricating the estate from its financial difficulties, even at some sacrifice of future values, by disposal of other parts of the estate property, they felt that this should be done, rather than that their honestly asserted rights should be jeopardized; but when it became apparent that this was impossible, owing to the position taken by the title companies, they entered into an agreement modifying their position for the benefit of the estate. Would the residuary legatee have done more had the position been reversed? The court doubts it.

The agreement whereby the quasi-lien of the sisters upon the personal property was released was entered into by all parties and was approved by counsel for the residuary legatee, as he admits in his brief. It was a valid agreement between competent parties and is binding upon all here concerned, being based upon a valid consideration.

The payments to counsel for the executors, while large, were eminently reasonable in view of the extended, laborious and exacting services required. The inability of the executors to find funds with which to pay taxes and assessments on the unproductive real estate was unfortunate but not reasonably avoidable in view of the nature of the estate and the lack of liquid resources. It was a condition identical with that with which the decedent labored during a large part of his life and which had compelled him to accept, without present remuneration, board and care from the two old ladies. The record is devoid of any demonstration that the executors did not do the most that could have been expected of them with the resources at their command.

The objections to the account as rendered are overruled, and the motion to remove the executors is denied. As a necessary corollary, the executors are entitled to their commissions.

There remains for consideration the claim of Adele Virnard. In the opinion of the court this has been sustained by competent evidence. The rules of law relating to such claims will not again be reviewed as they were fully considered in the recent opinion of this court in *Matter of Mason* (134 Misc. 902). On the other hand, it must be held that the benefit received by the claimant under the will is a *pro tanto* extinguishment of the claim against the decedent in this regard. (*Reynolds* v. *Robinson*, 64 N. Y. 589, 593; *Matter of Mason*, 134 Misc. 902, 915.) It follows, therefore, that she is entitled to be paid only the sum of $340, being the amount of her claim, less the value of the life estate given her by the will of the decedent, as fixed in the transfer tax proceeding. On this sum, however, she is entitled to interest from one year after the date of death.

The court, therefore, finds and determines that the intermediate accounts of the executors should be settled as presented and that from the sums remaining in their hands should be paid, *first*, the costs of this accounting; *second*, the commissions of the executors; *third*, the claim of Adele Virnard, as hereinbefore allowed, amounting to $340, with interest from December 7, 1916; and that thereupon the cash remaining in the hands of the executors should be paid out and distributed pursuant to the provisions of items " Third," " Fifth " and " Sixth " of the will.

Settle decree, on notice, accordingly.