# IN RE ESTATE OF MAY COOKE.
## HENRY M. KALSCHEUER v. CLAUDE H. ALLEN AND OTHERS.[1]

May 10, 1940.

No. 32,283.

*Kyle & Kyle* and *Claude H. Allen,* for appellants.
*Kennedy & Kennedy,* for respondent.

LORING, JUSTICE.

This appeal relates to a claim against the estate of May Cooke, deceased, which Kalscheuer filed in probate court for the sum of $10,825, all but $25 of which was alleged to be for services rendered the deceased between September 9, 1931, and September 9, 1937. The probate court disallowed the claim, and on appeal to

[1]Reported in 292 N. W. 96.

the district court issues were framed for a jury, which allowed the claim at $2,125. The case comes here upon appeal on behalf of the estate and the residuary legatees, who claim that the verdict was excessive and not justified by the evidence as well as that there was error in the charge.

May Cooke and her husband, Urban Cooke, were, prior to 1919, residents of South Dakota, where they were acquainted with Kalscheuer, who was then a young boy. Kalscheuer moved to St. Paul in 1897 and ever since 1917 has been in the banking business as an employe of the Commercial State Bank or City Bank of St. Paul. The Cookes were substantial depositors in the Commercial State Bank, carrying a balance which was usually $5,000 or more. At the time of her death (September 9, 1937) Mrs. Cooke held certificates of deposit in that bank amounting to $4,500 and had an open checking account of $3,200. Urban Cooke died November 11, 1936. At that time most of the Cooke property was held in joint tenancy with right of survivorship and was valued at approximately $53,000, the largest item of which was invested in 176 shares of Northern States Power Company stock which paid a six per cent dividend. There was a 720-acre farm in Spink county, South Dakota, a homestead residence at 1015 Van Slyke avenue in St. Paul, and a house at 1009 on the same avenue. After her husband's death Mrs. Cooke transferred the Northern States Power Company stock and other properties so that her estate was appraised at $25,005.14.

While there is little dispute that the Commercial State Bank invited the customers to consult its officers with reference to their investments, for which consultation no charge was to be made, it was conceded by appellants on the oral argument that there is sufficient evidence in the record to sustain a finding that services of that character were rendered by Kalscheuer to the Cookes and, after her husband's death, to Mrs. Cooke upon assurances that such services would be compensated for by a testamentary disposition by the surviving spouse. In fact it was contended that

the record compelled such a finding. In her will Mrs. Cooke bequeathed to Kalscheuer a note secured by first mortgage on certain property in St. Paul, "said Henry Kalscheuer having been a close friend of both my late husband and myself." The amount of the note was $2,000, which was subsequently paid. She also left $1,000 cash to Kalscheuer's wife, "in recognition of her valued friendship and many acts of kindness." Altogether she left $12,600 in cash bequests, including the $1,000 to Mrs. Kalscheuer, and by specific devise she also disposed of all her real property, giving to Walter A. Peterson, a foster child, the 720 acres in Spink county as well as a cash bequest of $1,000. She acquitted Arnold Sidmore and her husband's brothers Nelson Cooke and Frank Cooke of any indebtedness which they might be owing her on contracts for deed or otherwise. She named two residuary legatees. She named Kalscheuer as one of her executors, whom she charged with the duty of seeing that her body was buried beside that of her late husband at Maneno, Illinois.

1. It is argued by the appellants that the legacy to the claimant was, as a matter of law, a payment either in full or in part of any claim he might have against the estate for services rendered. In his statement of the claim Kalscheuer asserted that it was agreed that he should be paid by the survivor or from the estate of the survivor. Claimant himself could not testify as to any conversations with either of the decedents, but his wife and Arnold Sidmore, who also made claim for services against the estate, testified in his behalf. Sidmore testified that Mrs. Cooke and her husband had previously said that Kalscheuer would be well paid for what he had done when she was through with her property and that she was going to make a will, that Kalscheuer and Sidmore were the ones who had stood by them and were to be well paid. On one occasion the Cookes had shown Sidmore a slip or memorandum on which there was a statement as to how they were going to have the will prepared to dispose of their property and that on this statement there was an item of $8,000 to $12,000 in the bank that was to go to Kalscheuer for the services he had

rendered. Mrs. Sidmore corroborated her husband to some extent. Mrs. Kalscheuer testified on behalf of her husband that both of the Cookes had stated to her or in her presence that they wanted her husband to have the bulk of their estate, and that in the last week in April, 1937, Mrs. Cooke said to her: "Urb and I have always agreed that Henry should share in the bequest of our estate, and I wanted it that way." Mr. Edward Bremer testified that the Cookes had told him that they intended to leave Kalscheuer $10,000 in their will. Shortly after the conversation with Mrs. Cooke in April, Kalscheuer engaged a lawyer to draw a will for Mrs. Cooke in which he was made residuary legatee. This will was executed, and Kalscheuer paid the lawyer's fee with his own personal check. We are convinced by the record that the evidence compels a finding that Mrs. Cooke and her husband promised to compensate Kalscheuer by testamentary disposition and that he so understood and consented to the arrangement. This raises a question not heretofore passed upon in this state by this court, namely, whether under such circumstances the so-called *pro tanto* rule should be applied. That rule is to the effect that where services are rendered upon the understanding that they are to be compensated for by testamentary disposition, the value of a legacy, unless otherwise stated in the will, shall be applied upon the reasonable value of such services either in full satisfaction or *pro tanto* as the case may be.

We think the rule is a just one and adopt it. Reynolds v. Robinson, 64 N. Y. 589, 593; In re Mason's Will, 134 Misc. 902, 236 N. Y. S. 720; Kujawski v. Sobelewski, 72 Pa. Sup. 326. If anything were needed to compel the conclusion that both Kalscheuer and Mrs. Cooke clearly understood that Kalscheuer was to be compensated by testamentary disposition, the arrangement made by Kalscheuer for the drafting and execution of the will which made him a residuary legatee of her estate would have supplied the lack. We discover no contrary intent in the language of the will. Not without interest is the fact that in his petition to admit the will to probate he stated that there were no

debts. The trial court erred in not charging the jury in conformance with the rule we adopt. It was requested to do so by the appellants.

2. It is the further contention of the appellants that the verdict is excessive and not justified by the evidence. Kalscheuer's claim for services was on the basis of $150 per month for the six-year period. At no time did the income of the Cookes aggregate more than $250 a month. It must be conceded that the investment in Northern States Power Company stock needed no attention whatever. As we have seen, the bank invited customers to confer with its officers about their investments. Kalscheuer kept no record of the services rendered and could segregate no items for which he could make a charge. He attended five or six meetings in connection with the Savage Company receivership and wrote as many letters in that connection; he arranged the sale of the South Dakota farms to their foster son, Walter Peterson, but would not say or could not say what would be a reasonable charge therefor. He collected the rent on the residence property near the Cooke's homestead for the period of one year. There is no satisfactory evidence that he performed any services in connection with the Schneider contract. He looked after five or six mortgages and probably deserves more compensation for this service than for anything else he did for the estate, but their aggregate amount was only about $10,500. The normal charge of a trust company for such service would not exceed $65 per year. The Home Owners Loan Corporation bonds required no effort whatever on his part. The property which was transferred by Mrs. Cooke does not seem to have required any special attention. It is true that he testified that he conferred with the Cookes or one of them on an average of a couple of times a week and that he investigated various proposed investments, but on this record we deem the verdict excessive and could not sustain any amount in excess of the legacy left to Kalscheuer. The motion in the lower court was for a new trial only. The order denying it must be and is reversed.

Reversed.

STONE, JUSTICE (concurring in the result).

I agree that there should be a new trial. Beyond that, my views are so far at variance with those expressed by my associates that I submit the following by way of explanation.

The nature of the agreement in such a case as this will ordinarily be a question of fact. Therefore I cannot concur in the process of basing decision upon any fixed rule of law such as that here made determinative. It is that:

"Where services are rendered upon the understanding that they are to be compensated for by testamentary disposition, the value of a legacy, unless otherwise stated in the will, shall be applied upon the reasonable value of such services either in full satisfaction or *pro tanto* as the case may be."

That proposition seems to me decisive for present purposes. But it should not be used as an absolute rule. It is rather and only a presumption which, in the absence of evidence *contra,* will control decision. The question to be decided is: What was the intention?

It has been, all through, the theory of both sides that plaintiff was promised payment "from the estate of the survivor" of the Cookes. That is the basis of the claim as pleaded. On this appeal the parties are in complete agreement that such was the understanding. For that reason, I cannot agree with Mr. Justice Peterson's statement that:

"There is no basis for a holding here that respondent's services were rendered under an agreement that he would be compensated by a testamentary provision. No such claim was made below or here."

Returning to the presumption—when one promises to do a certain thing at a stated time and for a particular purpose, and later performs that promise, there is a strong inference that the performance was for the purpose and with the intent first expressed. So, when a debtor promises to pay his creditor by legacy in his favor, and upon death it is discovered that such a legacy

has been made, there is certainly enough of an inference to make a rebuttable presumption that the legacy was intended as payment in full or *pro tanto*. My submission is that our decision should not go further than to allow the presumption its proper and limited scope. Whether in this case there is enough evidence to displace that presumption and send the case to the jury under the rule of Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557, should be decided upon the new trial, if one is had.

PETERSON, JUSTICE (dissenting).

1. There is no basis for a holding here that respondent's services were rendered under an agreement that he would be compensated by a testamentary provision. No such claim was made below or here. Respondent's claim is based upon an implied contract to compensate him by payment of the reasonable value of his services. The defense was that the services were rendered gratuitously and that the legacy was intended to be in full satisfaction of all services rendered.

In appellants' brief the claims of the parties are stated as follows: "In his statement of claim filed in the district court, claimant stated that the services were rendered under an express agreement whereby the Cookes agreed 'to pay and compensate claimant for such services, and further agreed *that he should be paid by the survivor, or from the estate of the survivor.'*" And "in appellants' answer to the statement of claim it was alleged that the services were performed gratuitously, without any expectation or understanding that compensation was to be made therefor, and that the provisions in the will in claimant's favor were substantially in excess of the reasonable value of any services rendered, and that the bequest to claimant amounted to payment of any claim he might have." The evidence related entirely to the issues thus made, and those issues were the only ones submitted to the jury.

Appellants' requests for instructions clearly recognized that no other issues were in the case. Request No. 1 was to the effect that if there were an agreement that respondent was to be

compensated by a testamentary provision the legacy was to be in full payment if it exceeded the services in value and was to be deducted from the amount thereof if of less value. The court refused to give the instruction as requested and eliminated that part which referred to the services as having been under an agreement to compensate respondent by a legacy. Appellants acquiesced in this ruling, did not assign it as error in the motion for new trial, and have not assigned error on it here. Request No. 2 was that respondent was not entitled to recover unless Mrs. Cooke had agreed to compensate him for services rendered both to her husband and herself. This request was given.

There is not one word of testimony that respondent was to be compensated by a provision in the will. Appellants offered no testimony on this point. Respondent was not permitted to testify on this point himself. His evidence was that Mrs. Cooke had made numerous statements to the effect that respondent was to be liberally compensated. There is not one word of testimony that she ever said that there was an agreement that the compensation was to take the form of a legacy, much less that she and respondent had so agreed. True, she talked about making wills. She executed more than one will. She had different plans at different times. She stated several times that she was going to will her entire estate to respondent. There is as much reason to hold that she agreed to leave him her entire estate as there is that she intended to compensate by will.

The will itself is silent with respect to this question. There are some 14 similar devises and bequests. The reasons for making them are stated. Three provisions were for the benefit of Mr. Cooke's relatives. No other reason is given for remembering them. The other 11 provisions include those for respondent, Sidmore, a foster son in fact, two former employes, and six friends. The provision for the foster son is stated to be made because of such relationship. Although respondent and Sidmore were the only two who had claims against Mrs. Cooke for services, they were treated like the other friends. The will recites that the provision for each of them was made because the testatrix

desired to distribute her estate to those who had been kind to her and her husband and made their lives most pleasant. She did not in this respect discriminate between those to whom she was and those to whom she was not indebted. Since the testatrix stated with particularity the reasons for each provision in her will, the inference is permissible, if not required, that none of the provisions were intended to be in satisfaction of her debts or she would have said so. Respondent satisfactorily explained his signing the petition for letters testamentary containing the statement that there were no debts. He told the lawyer who drew the petition that he intended to file his claim.

In that situation this court is not justified in finding as a matter of law that the services were rendered under a contract to compensate by a testamentary provision. We are not justified in making a finding for which there is no support in the record, or in deciding the case upon points which were not raised either below or here.

2. We should not adopt the so-called *pro tanto* rule announced in the decisions cited in the majority opinion, for the reasons that the rule does not rest on sound principles and has been repudiated in effect by all the courts which profess adherence to it. In adopting a rule for this class of cases we in effect make the law where none now exists. It is not only our province, but our duty, to adopt that rule which accords with sound legal principles and common sense.

The rule, which the majority adopts, is stated to be that a legacy to a creditor will be presumed, in the absence of expression to the contrary, to be intended as a satisfaction of the debt, in full if equal to or greater, or *pro tanto* if less than the debt. The rule is sustained by innumerable authorities. It has been repudiated in effect by an equally imposing array of authorities from the courts which apply the rule. To cite the cases would be to write a catalogue. See annotation, 86 A. L. R. 6, *et seq.* 69 C. J. p. 950, *et seq.*

We are not bound to follow the authorities one way or another however numerous they may be. The question being one of first

impression here, decisions in other states have persuasive authority only and are entitled to such consideration as their reasoning merits. "They are to be weighed, not counted." Gorrell v. Greensboro Water Supply Co. 124 N. C. 328, 335, 32 S. E. 720, 722, 46 L. R. A. 513, 70 A. S. R. 598, 14 Am. Jur., Courts, § 85.

The basis of the rule is a presumption of law which is contrary to the fact. In Reynolds v. Robinson, 82 N. Y. 103, 107, 37 Am. R. 555 (a subsequent appeal of the same case, 64 N. Y. 589, cited by the majority) this is pointed out in the following language:

"The law raises, in certain cases, presumptions *against the apparent intention* of the testator, and one of these presumptions is, that a legacy from a debtor to a creditor of a sum as great or greater than the debt was intended as a satisfaction."

This is contrary to all legal principles. The cardinal rule of construction is to ascertain the intention of the testator and to give it effect. To this rule all others are required to yield. "One of the highest duties resting upon a court is to carry out the intentions of a testator as expressed in valid provisions not repugnant to well-settled principles of public policy." 6 Dunnell, Minn. Dig. (2 ed. & Supps.) § 10257; In re Trust Under Will of Holden, 207 Minn. 211, 215, 291 N. W. 104. A presumption contrary to the testator's intention is a hindrance to discovering and giving effect to such intention and as such is contrary to the most fundamental principles in construing wills. Why should a court adopt a rule that rests upon a falsehood, which a presumption contrary to fact surely is?

That a rule resting on a false foundation could not be justified was to be expected. Story points out that it is difficult to vindicate the rule for the reason that what is given by a will ought from the character of the instrument to be deemed a bounty, and that the presumption goes contrary to that fact.

"The truth is that the doctrine was introduced originally upon very unsatisfactory grounds, and it now stands more upon authority than upon principle. And a strong disposition has been mani-

fested in modern times not to enlarge the sphere of its operation, but to lay hold of any circumstances to establish exceptions to it." Story, Equity Jurisprudence (14 ed.) §§ 1478, 1479.

Pomeroy's views are the same as Story's. 2 Pomeroy, Equity Jurisprudence (4 ed.) § 527, *et seq.* In 28 R. C. L. p. 299, § 277, the rule is criticized as follows:

"The rule is not founded in reason, and often tends to defeat the bounty of testators; and able chancellors have thought it more agreeable to equity to construe a testator to be both just and generous when the interests of third persons are not affected. Courts of justice will accordingly lay hold of slight circumstances to get rid of the rule. The presumption does not obtain where there is a direction in the will for the payment of debts, where the purpose of the legacy is expressly stated in the will, or where the testator merely bequeaths specific chattels to the creditor instead of giving him a money legacy. So where the legacy is smaller in amount than the debt, it will not be construed as a satisfaction of the debt. It is also well established that where the debt is unliquidated, or is owing on an open or running account between the parties, a legacy by the debtor to the creditor will not be deemed a satisfaction of the debt. Accordingly it has been held that a legacy by a debtor to his creditor did not constitute a satisfaction of the debt, when the same consisted of an unliquidated money demand due at the time of the testator's death, and the legacy was of specific chattels and money payable twelve months after the will was recorded."

The cases expressing similar views are found in the annotation, 86 A. L. R. at p. 16; 69 C. J. p. 950, *et seq.*

It is elementary that there can be no valid presumption unless there is rational and evidentiary relation between the fact presumed and the fact on which the presumption rests. It has been held that a statutory declaration that a fact shall be presumptive evidence of another is lacking in due process of law unless such a relation exists. Morrison v. California, 291 U. S. 82, 54 S. Ct.

281, 78 L. ed. 664, 20 Am. Jur., Evidence, §§ 9, 159. The rule that a legacy to a creditor is presumed to be payment of his debt seems to have survived notwithstanding that the presumption is admittedly contrary to the fact and violates sound legal and constitutional principles.

Such a rule was bound to be a source of trouble. There seems to have been no direct assault on the rule on constitutional grounds. But it has been overcome in practice in a great variety of ways. That judges would search out the truth in order to discover and effectuate the intention of testators was to be expected. The force of truth compelled them to recede from a rule that was based on a false presumption of fact. While giving lip service to a rule which by falsehood obstructed the quest for truth, they riddled the rule with exceptions and distinctions so as to reduce it to a shadow. The exceptions and distinctions are too numerous to be mentioned, but a few will illustrate what is meant. The presumption is held to be prevented from operating: Where the debt and legacy are of different natures, as to subject matter or extent of interest, Will of Shirley, 207 Wis. 549, 242 N. W. 207, 86 A. L. R. at p. 18; in consequence of which a legacy of specific chattels, as here, will not be deemed a satisfaction of an obligation to pay money, Strong v. Williams, 12 Mass. 391, 7 Am. D. 81; Deichman v. Arndt, 49 N. J. Eq. 106, 22 A. 799, note, L. R. A. 1915B, at p. 1176; where the purpose of the legacy is expressly stated in the will, as for example that the gift is in recognition of acts of kindness, as here, In re Arnton, 106 App. Div. 326, 94 N. Y. S. 471; or as a token of friendship, Newel v. Keith, 11 Vt. 214, see note, 86 A. L. R. pp. 21-23; where the will contains a direction to pay debts, as here, Crocker v. Beal (C. C.) 1 Low. 416, 6 Fed. Cas. No. 3,396, p. 825; Allen v. Etter, 92 Ind. App. 297, 175 N. E. 286; Perry v. Maxwell, 17 N. C. 488, where the court said at p. 499: "It is now understood that express direction in the will for the payment of debts requires the debt as well as the legacy to be paid; because the testator says that it is his intention"; Reynolds v. Robinson, 82 N. Y. 103, 37 Am. R. 555, *supra;* note, 86 A. L. R. pp. 23-26; 69 C. J. p. 957; or where

the debt is unliquidated, as here, Glover v. Patten, 165 U. S. 394, 17 S. Ct. 411, 41 L. ed. 760; Witt v. Witt, 105 Ind. App. 415, 12 N. E. (2d) 1013; Williams v. Crary, ·5 Cow. 368;· Horner's Executor v. McGaughy, 62 Pa. 189; note, 86 A. L. R. pp. 26-27; where, as here, the legacy is smaller than the debt, Reynolds v. Robinson, 82 N. Y. 103, 37 Am. R. 555, *supra,* note, 86 A. L. R. 29, and other numerous exceptions referred to in the annotation in 86 A. L. R. 6, and in 69 C. J. p. 950, *et seq.*

For over a century· the courts have recognized that the true rule is that the intention of the testator should control. In 1830 the court said, in Williams v. Crary, 4 Wend. 443, 449:

"The truth is, there are so many exceptions that the rule on this subject seems to be, that a legacy shall not be deemed a satisfaction of a pre-existing debt, unless it appears to have been the intention of the testator that it should so operate."

More recent cases express the same view. Buckner's Admr. v. Martin, 158 Ky. 522, 165 S. W. 665, L. R. A. 1915B, 1156. See note, 86 A. L. R. pp. 15-18; In re Arnton, 106 App. Div. 326, 94 N. Y. S. 471.

The ravages which exceptions and distinctions have made on the rule have all but nullified it. "The general rule has, however, been so often disapproved of, and has been held to be excluded by such slight indications of intention, that it is of small practical importance." Theobald, Wills (8 ed.) pp. 855-856.

Courts have continued to adhere to the presumption rule in form at least, even though they were of the opinion that the presumption was contrary to fact and violated the fundamental principle that the testator's intention should control. Instead of frank disavowal of the rule as being indefensible, nullification was in large measure accomplished by the numerous exceptions and distinctions mentioned. Where the rule was not nullified, it continued to set up a false presumption of fact contrary to the testamentary intention, which admittedly is the very thing that is to be ascertained in any case. Thus the presumption hindered rather .than assisted the quest for· truth. There can be no justifi-

cation for rules that do not facilitate judicial inquiry, much less for those that obstruct and defeat the process.

Many courts which profess adherence to the rule that a legacy to a creditor is presumed to be in payment of the debt have expressed the opinion that it would be better to abandon it, but have felt restrained from doing so by the doctrine of *stare decisis.* See 167 Law Times, 67.

We should know that if we adopt the rule we never shall apply it as it is stated and as it is professed to be. Like other courts, we shall limit it and nullify it by exceptions and distinctions. This, for the obvious reason that we shall not be deaf to the appeals of truth, which we shall discover, even if we have to circumvent the rule. We too shall arrive at the point where the rule will remain as a form only, if that is not true now as of the time when we adopt it. But, having once adopted the rule, the doctrine of *stare decisis* will prevent us also from ever getting rid of it. By not adopting the rule we at least shall keep the processes for the discovery of a testator's intention free from the hindrance of false presumption, to say nothing of saving ourselves from shamefaced pretending to adhere to a rule which we in practice ignore.

We ought not adopt a rule which is contrary to sound principle, which has been utterly discredited, and which will serve no useful purpose. We should adopt the rule suggested by Surrogate Delehanty in In re Estate of Herb, 163 Misc. 441, 296 N. Y. S. 491, that a legacy to a creditor is not to be deemed in satisfaction of a debt unless so intended by the testator, that testamentary intention is a fact question, and that the legacy, debt, other provisions of the will, and all the facts and circumstances of the case should be considered merely as factors bearing on the question of such intention.

3. The instant case comes within many of the exceptions. These have been indicated above. Hence the rule has no application here. The case was submitted under instructions which correctly stated the rules of law applicable to the fact situation.

4. The verdict is not excessive. This is not a case merely of collecting rents and interest, nor of incidental service rendered by a bank to its customers. Those matters were the least of the service rendered by the respondent. The evidence is uncontradicted that the Cookes made some bad investments. It appeared that they were about to lose a large part of their fortune as a consequence. They turned to respondent for assistance. He helped them to get rid of their bad investments and make good ones. Perhaps he spent too much time on the Cookes' affairs, but that was their fault as much as his. They came to the bank so often and took so much of respondent's time that the president of the bank told them that they would have to see respondent after banking hours. Respondent went to their home at least two or three evenings each week, staying there from 8:00 o'clock until 10:30 and even midnight. There is no dispute as to the amount of time he consumed in connection with their affairs. Certainly it cannot be said as a matter of law that he rendered such services as incidental to his duties as an officer of the bank or that he was not to be compensated. After deducting the disbursements, the verdict allowed respondent $350 per year. A fair estimate on the basis of the undisputed facts is that he devoted about 350 hours per year to their business. The verdict allowed him approximately one dollar per hour. We cannot say as a matter of law that the allowance is excessive. On its face it seems fair. His claim may have been too high; the verdict was not.

In my judgment the issues were ably litigated and fairly submitted. The verdict is not excessive and is amply sustained by the evidence. I think that there should be an affirmance.

MR. CHIEF JUSTICE GALLAGHER, being engaged on the pardon board when this case was argued, took no part in the consideration or decision of this case.